# **EXHIBIT B**

```
                                                Page 1
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3   ARTHUR L. BRASHER,        )
                               )
 4           Plaintiff,        )
                               )
 5   VS.                       ) Case No. 11-CV-0991
                               )
 6   BROADWIND ENERGY, INC.,   )
     et al.,                   )
 7                             )
             Defendants.       )
 8
 9           ORAL AND VIDEOTAPED DEPOSITION
                        OF
10                BRIAN MILTON GROTHUES
11
12        On November 9, 2012, between the hours of
13   9:07 a.m. and 10:53 a.m., in the offices of Fredericks
14   Reporting and Litigation Services, LLC, 3305 Northland
15   Drive, Suite 403, Austin, Texas, before me, WILLIAM M.
16   FREDERICKS, a Certified Shorthand Reporter for the
17   State of Texas, appeared BRIAN MILTON GROTHUES, who,
18   being by me first duly sworn, gave an oral deposition
19   at the instance of the Defendants in said cause,
20   pursuant to the Federal Rules of Civil Procedure.
21
22
23
24
```

```
                                                Page 2
 1              A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:
 3
         MR. WILLIAM B. FEDERMAN
 4       Federman & Sherwood
         10205 North Pennsylvania Avenue
 5       Oklahoma City, Oklahoma  73120
         (405)235-1560
 6       wbf@federmanlaw.com
 7
     FOR THE DEFENDANTS:
 8
         MS. MEREDITH JENKINS LAVAL
 9       Sidley Austin LLP
         One South Dearborn Street
10       Chicago, Illinois  60603
         (312)853-7121
11       mlaval@sidley.com
12
13   ALSO PRESENT:  Andy Fredericks, Videographer.
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                Page 3
 1                   I N D E X
 2   Appearances...................................... 2
 3
     BRIAN MILTON GROTHUES
 4       Examination by Ms. Laval..................... 5
 5
     Signature and Changes............................ 72
 6   Reporter's Certificate........................... 74
 7
 8                 E X H I B I T S
 9     NUMBER    DESCRIPTION                       PAGE
10       1      Document entitled "Plaintiffs
                Certification of Investment of
11              Broadwind Energy, Inc."             32
12       2      Document entitled "Complaint for
                Violation of the Federal
13              Securities Laws"                    39
14       3      Document entitled "Amended Class
                Action Complaint for Violation of
15              the Federal Securities Laws"        40
16       4      Defendants' First Interrogatory
                to Proposed Class Representative    44
17
         5      Plaintiff Brian M. Grothues'
18              Response and Objections to
                Defendants' First Interrogatory     44
19
         6      Defendants' Document Request        46
20
         7      Defendants' Document Request        49
21
         8      Plaintiff Brian Grothues'
22              Document Production                 50
23
24
```

```
                                                Page 4
 1            THE VIDEOGRAPHER:  My name is Andy
 2   Fredericks representing Veritext Litigation Services.
 3   The date is November 9th, 2012, and the time is
 4   approximately 10:07 a.m. (sic).  The deposition is
 5   being held in the office of Fredericks Reporting and
 6   Litigation Services at 3305 Northland Drive, Austin,
 7   Texas, 78731.
 8            The caption of this case is
 9   Arthur L. Brasher vs. Broadwind Energy, Incorporated,
10   et al., in the United States District Court for the
11   Northern District of Illinois, Eastern Division.
12            The name of the witness is Brian Milton
13   Grothues.
14            At this time will the attorneys please
15   identify themselves and the parties they represent,
16   after which the court reporter William Fredericks
17   representing Veritext Litigation Services will swear
18   in the witness and we can proceed.
19            MS. LAVAL:  Meredith Laval of Sidley
20   Austin LLP representing Broadwind Energy, Inc., and
21   J. Cameron Drecoll, Defendants.
22            MR. FEDERMAN:  William B. Federman, lead
23   counsel for the Plaintiffs.
24            THE REPORTER:  Raise your right hand,
```

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

Page 5

1  please, sir.
2              BRIAN MILTON GROTHUES,
3  having been first duly sworn, testified as follows:
4                     EXAMINATION
5  BY MS. LAVAL:
6      Q.   Hello.  My name is Meredith Laval.  We met
7  off the record --
8      A.   Uh-huh.
9      Q.   -- but I just wanted to introduce myself
10 again.  I represent Broadwind Energy, Inc., and
11 J. Cameron Drecoll, Defendants in this case.
12           Would you please state and spell your
13 name for the record.
14     A.   Yes.  Brian Milton Grothues.  B-r-i-a-n;
15 Milton, M-i-l-t-o-n; Grothues, G-r-o-t-h-u-e-s.
16     Q.   Have you ever been deposed before,
17 Mr. Grothues?
18     A.   I'm sorry.  Do what?
19     Q.   Have you ever been deposed before?
20     A.   No.
21     Q.   I just want to go over a few ground rules.
22     A.   Okay.
23     Q.   I'm going to be asking you a series of
24 questions.  Please answer each question truthfully and

Page 6

1  fully.  Agree?
2      A.   Agree.
3      Q.   Is there any reason why you cannot truthfully
4  and accurately respond to my questions today such as
5  due to medications?
6      A.   No.
7      Q.   The deposition is being videotaped, and the
8  testimony may be used in any relevant proceeding,
9  including a jury trial.  The questions and answers
10 today are also being recorded by a court reporter, so
11 I'll ask that you answer the questions verbally so
12 that the court reporter can get down your testimony.
13           Agree?
14     A.   Agree.
15     Q.   I will try not to interrupt or talk over your
16 answers, and I'll ask that you try to let me finish my
17 questions before answering.
18           Is that okay?
19     A.   Agree.
20     Q.   Your counsel may make objections for the
21 record today.  Unless your counsel instructs you not
22 to answer a question, I would ask you to answer the
23 question if you're able to do so.
24           Is that okay?

Page 7

1      A.   Yes.
2      Q.   If you don't understand one of my questions,
3  please let me know and I'll try to clarify.
4      A.   Okay.
5      Q.   And you can take a break whenever you need
6  one, but if there's a question pending, I'd ask that
7  you answer it before we break.
8           Is that all right?
9      A.   Yes.
10     Q.   So you testified earlier that you have never
11 been deposed before.  That's right?
12     A.   That's correct.
13     Q.   Have you ever testified in court?
14     A.   No.
15     Q.   Have you ever testified in any arbitration?
16     A.   No.
17     Q.   Have you testified in any administrative
18 proceeding?
19     A.   No.
20     Q.   Have you ever been a party to a lawsuit
21 before?
22     A.   No.
23     Q.   What's your current address?
24     A.   3108 Robinson Avenue in Austin, Texas 78722.

Page 8

1      Q.   All right.  Did you graduate from high
2  school?
3      A.   Yes.
4      Q.   What year did you graduate?
5      A.   2000.
6      Q.   Did you attend college?
7      A.   Yes.
8      Q.   Where did you attend college?
9      A.   The University of North Texas and the
10 University of Texas.
11     Q.   Did you graduate?
12     A.   Yes.
13     Q.   What degree did you get?
14     A.   A Bachelor's in piano pedagogy and a Master's
15 of Music in piano pedagogy.
16     Q.   And what year did you get your Bachelor's?
17     A.   Bachelor's, 2005.
18     Q.   And what year did you get your Master's?
19     A.   2008.
20     Q.   Do you have any other postgraduate degrees?
21     A.   No.
22     Q.   Do you hold any professional licenses?
23     A.   No.
24     Q.   Could you please describe your employment

Page 9

1  history post -- after college.
2      A.  Okay.  I'm a piano teacher, and I currently
3  work at the Orpheus Academy of Music, and I have
4  private students.  And aside from that, just a
5  freelance musician.  I play in bands and weddings and
6  gigs.
7      Q.  And how long have you been working at the
8  Orpheus Academy of Music?
9      A.  Five years now.
10     Q.  Do you understand why you're being deposed
11 today?
12     A.  Yes.
13     Q.  Could you state your understanding, please.
14     A.  Yes.  In the suit of Broadwind, they have
15 failed to state their -- their assets in regards to
16 Clipper and GE.  They -- they failed to write down an
17 impairment of 82 million and which that impairment was
18 reported after a public offering, and it should have
19 been reported when they had knowledge of it before the
20 public offering.
21     Q.  What did you do to prepare yourself for the
22 deposition today?
23     A.  I read through the amended complaint; the
24 judge's order granting and denying in part Defendants'

Page 10

1  motion to dismiss.  What else.  The other briefings
2  regarding objections to documents and so forth.  The
3  motion -- the motion to certify.
4      Q.  Other than those documents that you've just
5  described, did you examine any other documents in
6  preparation for the deposition?
7      A.  I looked through my statements, account
8  statements.
9      Q.  And those account statements, are those --
10 were those statements produced to the Defendants?
11     A.  Yes, they were.
12     Q.  Did any of those documents refresh your
13 recollection?
14     A.  A little bit, yes.
15     Q.  Could you tell me which ones?
16     A.  I don't recall.  It was -- there's just a --
17 it's a huge -- I invested from June 2009 through
18 January 2010, so I was just going through all of those
19 statements.
20     Q.  Did you -- sorry.  Did you examine any other
21 documents other than the ones that you've already
22 described?
23     A.  I think that's about it, yeah.  That's it.
24     Q.  And I'm not interested in the content of any

Page 11

1  discussion you had with your lawyer, but did you meet
2  with your lawyer?
3      A.  We've talked through e-mail and over the
4  phone.  This is the first time we met.
5      Q.  And about how often have you communicated by
6  e-mail?
7      A.  Oh, I don't know.  It's been -- there's been
8  many e-mails.  Let's say at least 20.
9      Q.  And about how often have you talked on the
10 phone?
11     A.  About once a week at least in the last couple
12 weeks.
13     Q.  Did you have any conversations with anyone
14 other than your lawyer in preparation for this
15 deposition?
16     A.  I've had -- I've been in correspondence with
17 three or so lawyers from Federman & Sherwood, like
18 Stuart, Jennifer, Joshua.
19     Q.  And have you had any conversations or
20 correspondence with anyone else about this litigation?
21     A.  No.
22     Q.  You testified earlier that you've never been
23 a party to a lawsuit before, correct?
24     A.  That's correct.

Page 12

1      Q.  Have you ever been responsible for monitoring
2  complex litigation?
3      A.  No.
4      Q.  Do you have any experience selecting counsel
5  to handle class actions?
6      A.  No.
7      Q.  And do you have any experience monitoring a
8  law firm's handling of litigation?
9      A.  No.
10     Q.  How did you first become aware of this case?
11     A.  Through a news feed in my Google Finance
12 website, a news feed regarding Broadwind.
13     Q.  And is that a feed that gives you stories
14 or --
15     A.  Right.  Analyst coverage and different
16 stories about the business.
17     Q.  And do you recall the story that you saw in
18 your news feed that prompted your awareness of this
19 case?
20     A.  I don't recall exactly, but just that there
21 was an investigation and -- right.  Yeah.
22     Q.  And do you recall about when that was?
23     A.  I don't recall exactly.  I imagine it was in
24 2009.

Page 13

1  Q. When did you first consider becoming involved
2  in this case?
3  A. When I saw that my -- when I owned the stock
4  that -- that corresponded with the dates that the case
5  was questioning.
6  Q. And when you refer here to when it
7  corresponded with the dates the case was questioning,
8  those were as was described in the article that you
9  saw in your news feed, is that right?
10 A. Repeat your question.
11 Q. So when you say that you saw that your -- the
12 dates that you owned the stock corresponded with the
13 dates the case was questioning --
14 A. Uh-huh.
15 Q. -- when you say "the case" there, you're
16 referring to what was -- what you saw in an article in
17 your news feed?
18 A. Right. That's correct.
19 Q. Did you discuss whether you should become
20 involved in this case with anyone other than your
21 attorneys?
22 A. No.
23 Q. And do you have an understanding of what this
24 case is about?

Page 14

1  A. Yes.
2  Q. And what's your understanding?
3  A. Broadwind violated SEC rulings by failing to
4  write down a large impairment and which they're
5  responsible to make knowledgeable to their investors.
6  Q. And what is your understanding based on?
7  A. It's based on the amended complaint and the
8  judge's order granting and denying in part the motion
9  to dismiss.
10 Q. Could you describe for me your personal
11 understanding of the claims that you're asserting
12 against the Defendants in this case?
13        MR. FEDERMAN: You mean other than what
14 he's now said twice?
15        MS. LAVAL: I'm --
16        MR. FEDERMAN: I --
17 Q. (BY MS. LAVAL) Could you answer the
18 question, please.
19        MR. FEDERMAN: No. Wait a second.
20 You're asking the same question the third time simply
21 in a different way, but you're seeking to elicit the
22 same information. So this time I'm going to allow it,
23 but --
24        MS. LAVAL: I --

Page 15

1         MR. FEDERMAN: -- we're not going to
2  repeat things. I mean, I see you have a list and
3  you're checking off your questions, but his response
4  has already covered this ground twice. So do you want
5  to repeat the question.
6  Q. (BY MS. LAVAL) Could you describe for me
7  your personal understanding of the claims you're
8  asserting against the Defendants in this lawsuit?
9  A. Yes. The defend- -- the Defendants, Drecoll
10 and -- and Broadwind, had a large impairment that
11 surely didn't fall out of the sky, and they failed to
12 report this to investors until after a public
13 offering.
14 Q. And you mentioned Mr. Drecoll. Do you know
15 who J. Cameron Drecoll is?
16 A. The CEO of Broadwind.
17 Q. Have you had any contact with Mr. Drecoll?
18 A. No.
19 Q. Have you had any contact with Broadwind?
20 A. No.
21 Q. Have you had any contact with any employees
22 of Broadwind?
23 A. No.
24 Q. Any former employees of Broadwind?

Page 16

1  A. No.
2  Q. What is your understanding of what goodwill
3  is?
4  A. My understanding is it's the assets in which
5  they presume to have the money that they assume will
6  be there; contracts that should be good.
7  Q. And what's the basis of your understanding?
8  A. I actually --
9         MR. FEDERMAN: Well, don't -- don't
10 disclose anything you've discussed with me or
11 information your attorneys have provided you. Okay?
12 So if you can answer the question -- I don't think
13 she's asking you for knowledge you've gained from
14 communications with attorneys.
15        THE WITNESS: No.
16        MS. LAVAL: No, I'm not.
17        MR. FEDERMAN: Okay. So if you have
18 knowledge about goodwill and accounting functions
19 and GAAP --
20        THE WITNESS: No.
21        MR. FEDERMAN: -- outside of what we --
22 your attorneys have discussed with you --
23        THE WITNESS: No, I don't.
24 Q. (BY MS. LAVAL) And what is your

Page 17

1 understanding of what an impairment charge is?
2     A.   My understanding -- I mean, I'm not -- I'm a
3 musician, I'm not a business person, but my
4 understanding is that it's a large -- an impairment
5 would be basically the -- the funds are not there.
6 It's a -- it's a -- it's a loss.
7     Q.   And aside from an understanding that you may
8 have gained from any conversations with your
9 attorneys, is there any other basis for your
10 understanding of that?
11     A.   No.
12     Q.   Do you understand that this is a class
13 action?
14     A.   Yes, I do.
15     Q.   What is that?
16     A.   A class action is a lawsuit representing many
17 plaintiffs.
18     Q.   And you understand that you're being proposed
19 as a class representative in this action?
20     A.   Yes, I do.
21     Q.   And what's your understanding of what a class
22 representative is?
23     A.   A class representative simply represents the
24 class of investors.

Page 18

1     Q.   Could you describe the class that you're
2 seeking to represent?
3     A.   Yes.  The class is investors such as myself
4 who invested in Broadwind during the confines of this
5 case.
6     Q.   And why do you want to represent a class of
7 Broadwind shareholders in this litigation?
8     A.   Just to see that everyone is equally
9 compensated for their losses.
10     Q.   Do you know what the class period is in this
11 case?
12     A.   I don't recall exactly.
13     Q.   What do you believe will be your duties if
14 you were appointed as a class representative?
15     A.   Simply to stay informed with the case, stay
16 in contact with my lawyers, read any briefs on the
17 case, and be available for deposition.
18     Q.   Other than the ones that -- the duties that
19 you just named, would you have any other
20 responsibilities or duties?
21     A.   I don't recall.
22     Q.   Do you know if there are other individuals or
23 entities that have been put forward to serve as class
24 representatives in this action?

Page 19

1     A.   I don't recall.
2     Q.   Have you ever heard of Jerry Pehlke?
3     A.   Yes.
4     Q.   And when did you first hear about him?
5     A.   Reading the -- the briefs, the amended
6 complaint.
7     Q.   Have you ever had any communication with him?
8     A.   No.
9     Q.   Do you understand -- do you have an
10 understanding of whether he is still a proposed class
11 representative in this case?
12     A.   I believe he is.  I just believe he couldn't
13 make it.
14     Q.   I'm sorry.  Could you repeat that?
15     A.   I believe he is a class representative.  I
16 just believe he couldn't make it here today.
17     Q.   Do you have any understanding of how the
18 other proposed class representatives were selected?
19     A.   No.
20     Q.   Did you play any -- so you didn't play any
21 role in the section of the other proposed class
22 representatives?
23     A.   No.
24     Q.   And --

Page 20

1     THE REPORTER:  We need to go off the
2 record for one second, please.
3     MS. LAVAL:  Oh, sure.
4     THE VIDEOGRAPHER:  The time is
5 9:24 a.m., and we are going off the record.
6     (Recess.)
7     (Record read.)
8     THE VIDEOGRAPHER:  The time is
9 10:31 a.m. (sic).  This is the continuation of
10 Tape No. 1, and we are back on the record.
11     Q.   (BY MS. LAVAL)  And did you ever speak to
12 anyone else who was considered as a proposed class
13 representative but not put forward as one?
14     A.   No.
15     Q.   Do you have an understanding of how you
16 personally were selected to be a class representative?
17     A.   No.
18     Q.   Is fair to say that your counsel chose you as
19 a potential class representative?
20     A.   Yes.
21     Q.   Have you had any communications or contact
22 with other members of the proposed class?
23     A.   No.
24     Q.   Have you ever been a class representative in

Page 21

1  another proposed class action?
2  A. No.
3  Q. Have you ever sought to be a class
4  representative in another proposed class action
5  lawsuit?
6  A. No.
7  Q. Are you aware that a lead plaintiff has been
8  appointed by the Court in this action?
9  A. Yes.
10 Q. Do you know who the lead plaintiff is?
11 A. I believe I am now.
12 Q. And what's your understanding based on?
13 A. Simply that Jerry Pehlke has had some
14 personal problems with Hurricane Sandy and most likely
15 will not be able to be the lead plaintiff.
16 Q. And when did you first become aware that you
17 might become the lead plaintiff?
18 A. Last week.
19 Q. What do you understand about the duties of a
20 lead plaintiff in this action?
21 A. To stay in contact with the lawyers, with my
22 attorney, to stay informed of the case and read any
23 briefs or memorandums regarding the case, and just be
24 available for testimony or deposition.

Page 22

1  Q. And prior to last week, had you wanted to
2  become the lead plaintiff?
3  A. It's -- I'm fine with it, yeah.
4  Q. Which attorneys did you first come into
5  contact with in connection with this case?
6  A. I believe it was Federman & Sherwood.
7  Q. And how did you come in contact with them?
8  A. Via e-mail.
9  Q. Did you e-mail them or did they e-mail you?
10 A. I e-mailed them.
11 Q. Do you recall approximately when this was?
12 A. I don't recall exactly.
13 Q. Was this after you became aware of the
14 existence of this -- of the lawsuit?
15 A. Yes.
16 Q. Is it your understanding that Federman &
17 Sherwood is serving as lead counsel in this case?
18 A. Yes.
19     THE REPORTER: Meredith, put that other
20 microphone on there. There you go.
21     (Discussion off the record.)
22 Q. (BY MS. LAVAL) But you did not retain
23 Federman & Sherwood to -- to serve as lead counsel to
24 the class?

Page 23

1  A. No.
2  Q. Do you understand how they came to be
3  selected?
4  A. Not exactly.
5  Q. Did you sign an engagement letter with
6  Federman & Sherwood?
7  A. Yes.
8  Q. Do you still have a copy of it?
9  A. I mailed in -- if the engagement letter
10 was -- was -- yeah, I -- I mailed it -- I signed it
11 and mailed it in, but I don't currently have a copy of
12 it.
13 Q. Does Federman & Sherwood provide portfolio
14 monitoring services for you?
15 A. No.
16 Q. Do you know what that is?
17 A. No, but it sounds like it's more in regards
18 to investing.
19 Q. So you -- do you have anybody who provides
20 that service for you?
21 A. No.
22 Q. How did you decide to retain Federman &
23 Sherwood?
24 A. Simply that they were who I contacted, and --

Page 24

1  and they were listed as counsel in this case.
2  Q. So why did you initially contact them?
3  A. After I read the news article that there was
4  a suit being filed, that's when I contacted them.
5  Q. And were they mentioned in that article?
6  A. Yes.
7  Q. Do you know if it was a news article or a
8  press release?
9  A. I don't recall. It was probably a press
10 release.
11 Q. And was their contact information on that
12 document?
13 A. Yes.
14 Q. And you said you contacted them by e-mail?
15 A. Yes.
16 Q. So that's how you got their e-mail address?
17 A. That's correct.
18 Q. Okay. Did you consider any other firms?
19 A. I don't recall. It was quite a while ago.
20 Q. Do you have any role in monitoring Federman &
21 Sherwood's work on this case?
22 A. In monitoring? I just stay updated and --
23 and read the -- the filings.
24 Q. Whose responsibility is it to make key

Page 25

1 decisions?
2     A.   Key decisions? I assume the attorneys.
3     Q.   Is there an arrangement in place for
4 Federman & Sherwood to be compensated for their work?
5     A.   A contingency agreement.
6     Q.   Is this part of the engagement letter that
7 you signed?
8     A.   I signed a contingency agreement. I'm not --
9 I don't recall -- how did you -- what did you call it?
10     Q.   Earlier we talked about --
11     A.   An agreement?
12     Q.   -- the engagement letter.
13     A.   Oh, engagement letter. I was thinking of a
14 contingency agreement.
15     Q.   So when you said that you sent something back
16 to them and didn't keep a copy, that --
17     A.   That was the contingency agreement.
18     Q.   Just so that we make a clean record, I guess
19 I'm going to try to finish my questions fully, and
20 then if you can wait to answer --
21     A.   Okay.
22     Q.   -- it makes it cleaner --
23     A.   Okay.
24     Q.   -- when it's written down.

Veritext Chicago Reporting Company
312-442-9087   800-248-3290   847-406-3200

Page 26

1     A.   Sure thing.
2     Q.   Are you familiar with the details of the
3 contingency agreement?
4     A.   Just simply that if there is -- if my
5 lawyers -- if we don't win the case, then there is no
6 awards on either side.
7     Q.   Do you know what their compensation would be
8 if -- if you do win the case?
9     A.   No.
10     Q.   Did you have any role in negotiating the
11 contingency agreement?
12     A.   No.
13     Q.   Do you believe you have a responsibility to
14 be aware of how the lawyers in this case will be
15 compensated?
16     A.   No.
17     Q.   Do you know if there are any other law firms
18 representing the Plaintiffs in this case?
19     A.   I believe there are. I can't recall the name
20 of them.
21     Q.   Does the name -- are you aware of the law
22 firm Robbins Geller?
23     A.   No.
24     Q.   Have you -- are you aware of James T. Crotty?

Veritext Chicago Reporting Company
312-442-9087   800-248-3290   847-406-3200

Page 27

1     A.   No.
2     Q.   Did you approve the involvement of the other
3 law firms in this case?
4     A.   No.
5     Q.   Do you know what the role of the other law
6 firms in this case is?
7     A.   No.
8     Q.   Do you have any role in overseeing any work
9 that the other law firms in this case are doing?
10     A.   No.
11     Q.   Do you have any responsibility to ensure that
12 there is no unnecessary duplication of effort or
13 inefficiencies?
14     A.   No.
15     Q.   Are you aware of any arrangement for the
16 other law firms in this case to be compensated?
17     A.   No.
18     Q.   Are you aware of any agreement between
19 Federman & Sherwood and the other law firms in this
20 case?
21     A.   No.
22     Q.   Do you have any say in how this case is being
23 litigated?
24     A.   No.

Veritext Chicago Reporting Company
312-442-9087   800-248-3290   847-406-3200

Page 28

1     Q.   Have you -- well, we talked a little bit
2 about things that you've done to keep abreast of
3 developments in this case, and you said that you've
4 read some of the pleadings, is that right?
5     A.   That's correct.
6            MR. FEDERMAN: He said it three times.
7     Q.   (BY MS. LAVAL) What's your understanding of
8 the current status of this lawsuit?
9     A.   We're in the motion to -- to be certified as
10 a class action and that the judge has -- has granted
11 in part the Defendants' -- excuse me -- the
12 Plaintiffs' arguments.
13     Q.   Other than reading some of the pleadings that
14 you testified about earlier, what else have you done
15 to keep abreast of developments in this case?
16     A.   That's about it.
17     Q.   Have you done anything to monitor counsel's
18 prosecution of this lawsuit?
19     A.   No.
20     Q.   Since you became involved in this lawsuit,
21 have you called your attorneys to inquire as to the
22 progress of the case?
23     A.   Maybe once by e-mail.
24     Q.   Do you receive any periodic updates on how

Veritext Chicago Reporting Company
312-442-9087   800-248-3290   847-406-3200

Page 29

1  the case is going?
2  A. Yes.
3  Q. Do you know about how often that is?
4  A. As soon as there's any developments.
5  Q. Other than in connection with preparing for
6  this deposition, when was the last time you spoke with
7  your counsel?
8  A. Through e-mail we've -- probably three weeks
9  ago.
10 Q. Do you know whether there have been any
11 settlement discussions in this case?
12 A. There has been settlement discussions.
13 Q. Have you been involved in any decisions
14 regarding whether Plaintiffs should make a settlement
15 demand to Defendants or otherwise pursue settlement
16 negotiations?
17 A. No.
18 Q. Are you aware that a mediation occurred?
19 A. Yes.
20 Q. Were you involved in any decisions regarding
21 the mediation?
22 A. No. I was informed of it.
23 Q. Were you informed before the mediation or
24 after?

Page 30

1  A. Both.
2  Q. Are you aware that Defendants have made a
3  settlement offer to Plaintiffs that's still on the
4  table?
5  A. Yes.
6  Q. Has your counsel communicated that offer to
7  you?
8  A. Yes.
9  Q. Have -- you don't have to tell me the content
10 of these communications, but have you discussed it
11 with your counsel?
12 A. Yes.
13 Q. We've talked about the motion for class
14 certification filed by your counsel.
15    Did you review that motion before it was
16 filed?
17 A. I don't recall.
18 Q. Did you have any input into the motion for
19 class certification before it was filed?
20 A. Well, yes. I was in contact with my
21 attorneys before it was filed.
22 Q. Do you recall whether you've signed any
23 documents in this case that were filed with the Court?
24 A. Yes.

Page 31

1  Q. And do you know what that is?
2  A. Well, let's see. I've just signed the
3  contingency agreement. I don't really recall that --
4  if I signed any other documents.
5  Q. Do you expect to be compensated for your
6  services as a class plaintiff?
7  A. Not necessarily.
8  Q. What do you mean by that when you say
9  "not" --
10 A. Well, just depending on how the case --
11 obviously if the -- if the Plaintiffs win the case,
12 then -- then yes.
13 Q. And do you expect to receive any compensation
14 if the Plaintiffs win the case that would be different
15 from what the other members of the class would
16 receive?
17 A. No.
18 Q. Have you made any agreements with counsel for
19 reimbursement of costs or waiver of costs if your
20 lawyers are not successful?
21 A. I don't recall.
22 Q. Are you willing and able to testify at trial
23 if necessary?
24 A. Yes.

Page 32

1  Q. Are you willing and able to proceed with this
2  lawsuit if it's not certified as a class action?
3  A. I don't recall that being an option.
4  Q. If it were, would you be willing and able to
5  proceed, or do you know?
6  A. Yes.
7     MS. LAVAL: I'd like to mark an exhibit.
8  I think we should call this Grothues Exhibit 1.
9     (Grothues Deposition Exhibit 1 marked.)
10    MR. FEDERMAN: How are you designating
11 this?
12    MS. LAVAL: Grothues Exhibit 1.
13    Could we go off the record for a second,
14 please.
15    THE REPORTER: Stand by, please.
16    THE VIDEOGRAPHER: The time is 10:40 --
17 or 9:46 a.m., and we are off the record.
18    (Discussion off the record.)
19    THE VIDEOGRAPHER: The time is
20 9:50 a.m. This is the beginning of Tape No. 2, and we
21 are back on the record.
22    MR. FEDERMAN: Let the record just
23 reflect that Exhibit 1 is a two-page -- a two-sided,
24 one-page document. Or is it --

Page 33

1   MS. LAVAL: He has a --
2   THE WITNESS: I have a --
3   MR. FEDERMAN: Oh, it's two pages for
4   the witness.
5   THE WITNESS: Yeah.
6   MS. LAVAL: Yes. I --
7   MR. FEDERMAN: Okay.
8   MS. LAVAL: Just to save a little space.
9   MR. FEDERMAN: That's very green of you.
10  MS. LAVAL: Right.
11  Q. (BY MS. LAVAL) The court reporter has handed
12  you an exhibit that's marked Grothues Exhibit 1.
13      Do you recognize this document?
14  A. Yes.
15  Q. And what is it?
16  A. This was logging when I purchased and sold
17  stocks of Broadwind.
18  Q. On the top of this document, it says
19  "Plaintiffs Certification of Investment of
20  Broadwind Energy, Inc.," is that right?
21  A. Yes.
22  Q. And is this your handwriting?
23  A. Yes, it is.
24  Q. And at the bottom of -- of the first page is

Page 34

1   your signature?
2   A. Yes, it is.
3   Q. And this is dated February 15th, 2011, is
4   that right?
5   A. That's correct.
6   Q. How did you receive this certification form?
7   A. This was the first documents I believe I
8   received after contacting Federman & Sherwood.
9   Q. Do you recall about when that was?
10  A. You know, I don't recall the dates exactly,
11  but I -- it looks like I filled it out in February
12  2011.
13  Q. So this was sent to you by Federman &
14  Sherwood?
15  A. Yes, it was.
16  Q. Did you receive any other materials at the
17  same time?
18  A. I don't recall at that point.
19  Q. Did you receive this by e-mail?
20  A. Yes.
21  Q. Was it accompanied by a letter?
22  A. Yes, there was at least an e-mail draft.
23  Q. Do you recall what that said?
24  A. No, I don't.

Page 35

1   Q. Do you still have a copy of the cover e-mail?
2   A. Not physically.
3   Q. But in your e-mail would you have a -- do
4   you -- do you have it?
5   A. I presume so, yes.
6   Q. Did you request this form?
7   A. No.
8   Q. But it was sent to you after you contacted --
9   you reached out to Federman & Sherwood?
10  A. That's correct, after I told them I had
11  purchased shares of Broadwind.
12  Q. And so you contacted them after you read on
13  the news feed about the existence of the lawsuit, is
14  that right?
15  A. That's correct.
16  Q. Prior to request -- contacting Federman &
17  Sherwood in connection with this case, had you ever
18  initiated contact with anyone at Federman & Sherwood
19  about any other litigation?
20  A. No.
21  Q. Why did you fill out this form?
22  A. I filled out this form because the dates I
23  had bought or purchased shares of Broadwind
24  corresponded with the dates in question over the --

Page 36

1   the lawsuit against Broadwind.
2   Q. Did you believe that you needed to fill out
3   and return the certification in order to participate
4   in any recovery that might be obtained on behalf of
5   the class?
6   A. Yes.
7   Q. Is it fair to say that you were recruited by
8   Federman & Sherwood?
9       MR. FEDERMAN: Excuse me?
10  Q. (BY MS. LAVAL) I said is it fair to say that
11  you were recruited by Federman & Sherwood?
12      MR. FEDERMAN: I'll object to the form.
13  A. No.
14      MR. FEDERMAN: And I'm offended by the
15  question.
16      MS. LAVAL: I'm sorry.
17  Q. (BY MS. LAVAL) Did you read the
18  certification before signing it?
19  A. Yes.
20  Q. Did you research or discuss the case with
21  anyone else before you signed the certification?
22      MR. FEDERMAN: You've asked that
23  question. No. Go back to your notes and read where
24  you asked it before. If you're going to ask offensive

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

Page 73

I, BRIAN MILTON GROTHUES, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

                    BRIAN MILTON GROTHUES

THE STATE OF                    )
COUNTY OF                       )
     Before me, _____,
on this day personally appeared BRIAN MILTON GROTHUES, known to me (or proved to me under oath or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that the executed the same for the purposes and consideration therein expressed.
     Given under my hand and seal of office this day of _____, 2012.

               NOTARY PUBLIC IN AND FOR

               THE STATE OF

---

Page 74

STATE OF TEXAS    )
COUNTY OF TRAVIS  )
     I, WILLIAM M. FREDERICKS, CSR No. 2392, do hereby certify that, pursuant to the agreement hereinabove set forth, there came before me on November 9, 2012, at 9:07 o'clock a.m., in the offices of Fredericks Reporting and Litigation Services, LLC, 3305 Northland Drive, Suite 403, Austin, Texas, the following named person, to wit: BRIAN MILTON GROTHUES, who was by me duly sworn to testify to the truth and nothing but the truth of the witness' knowledge touching and concerning the matters in controversy in this cause; that such witness was thereupon examined under oath, and the examination transcribed by computer-assisted transcription by me or under my supervision, and that the deposition is a true record of the testimony given by the witness.
     I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

---

Page 75

     IN WITNESS WHEREOF I have hereunto set my hand and affixed my seal on this 12th day of November, A.D. 2012.

               William M. Fredericks, CSR No. 2392
               Expiration Date: 12/31/2013
               Firm Registration No. 611
               Fredericks Reporting & Litigation
               Services, LLC
               3305 Northland Drive, Suite 403
               Austin, Texas 78731
               Telephone: (512) 477-9911
               Fax: (512) 345-1417

FRL JOB NO. 6102
VERITEXT JOB NO. 1545485

---

[& - amended] Page 1

**&**
& 2:4 11:17 22:6,16 22:23 23:6,13,22 24:20 25:4 27:19 34:8,13 35:9,16,18 36:8,11 75:7

**0**
0991 1:5

**1**
1 3:10 20:10 32:8,9 32:12,23 33:12 38:24 62:8 65:2
10 55:5,9
10205 2:4
10:07 4:4
10:26 62:2
10:31 20:9
10:40 32:16
10:41 62:5
10:53 1:13 71:14
11 1:5 63:2
12/31/2013 75:6
12th 66:23 67:1,19 75:2
13th 41:3
1545485 75:11
15th 34:3
16th 38:11
17 49:8
178 66:24 67:3
17th 45:20 49:11
18 49:14
19th 66:7

**2**
2 3:2,12 32:20 39:13 39:16 40:1 41:23
20 11:8
2000 8:5
2005 8:17
2008 8:19 51:20 54:11 64:2
2009 10:17 12:24 38:4,11 59:4 60:22
62:14,21 64:3
2010 10:18 38:12,15 38:19 59:4 65:6 66:7,23 67:1,19
2011 34:3,12 41:3
2012 1:12 4:3 45:20 49:11 73:22 74:6 75:3
235-1560 2:5
2392 74:3 75:5
25,000 58:21
26th 62:21 64:3

**3**
3 3:14 37:20 40:14 40:15,18 45:17 62:5 71:14
3000 64:5,12
3108 7:24
312 2:10
32 3:11
3305 1:14 4:6 74:8 75:8
345-1417 75:9
39 3:13
3rd 38:4 62:14

**4**
4 3:16 44:6,7,10
40 3:15
403 1:15 74:8 75:8
405 2:5
44 3:16,18 38:4 62:14
46 3:19
477-9911 75:9
49 3:20

**5**
5 3:4,17 44:24 45:1 45:4
50 3:22
512 75:9,9

**6**
6 3:19 46:4,5,8
60603 2:10
6102 75:11
611 75:6
6th 65:3

**7**
7 3:20 48:22,23 49:1 49:4 57:20
72 3:5
73120 2:5
74 3:6
78722 7:24
78731 4:7 75:8
7th 65:3

**8**
8 3:21 48:21 50:7,8 50:11 57:22 58:1 70:10
82 9:17
853-7121 2:10

**9**
9 1:12 74:6
9.00 63:2
9:07 1:13 74:6
9:24 20:5
9:46 32:17
9:50 32:20
9th 4:3 38:11,15,19

**a**
a.d. 75:3
a.m. 1:13,13 4:4 20:5,9 32:17,20 62:2,5 71:14 74:6
a123 52:21
able 6:23 21:15 31:22 32:1,4
abreast 28:2,15
academy 9:3,8
accepting 71:6
accompanied 34:21
account 10:7,9 47:4 50:20 58:5,17 59:22
59:23
accounting 16:18
accurate 39:5 41:19 43:14 44:2
accurately 6:4 38:9
acknowledged 73:19
acronym 58:24,24
action 3:14 17:13,16 17:19 18:24 21:1,4 21:8,20 28:10 32:2 39:2 40:19 54:21 74:20,24
actions 12:5
add 60:15
added 64:4,11,16
additional 40:1,6
address 7:23 24:16
administration 47:2 52:4
administrative 7:17
advice 59:16
adviser 50:24
affect 64:12 65:23
affix 73:7
affixed 75:2
ago 24:19 29:9 55:13 68:10,14
agree 6:1,2,13,14,19
agreement 25:5,8,11 25:14,17 26:3,11 27:18 31:3 74:4
agreements 31:18
ahead 63:3
al 1:6 4:10
alert 56:5,7
allegations 42:5,14 43:13 44:1
alleged 41:19
allow 14:22
alternative 52:16,16 52:17,24 60:23 61:4
amended 3:14 9:23 14:7 19:5 40:19