# **EXHIBIT C**

Page 1

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF ILLINOIS
3  Civil Action No. 11 CV 991
4  ------------------------------x
   ARTHUR L. BRASHER, et al.,
5
            Plaintiffs,
6
         vs.
7
   BROADWIND ENERGY, INC.,
8  et al.,
9           Defendants.
   ------------------------------x
10
11
12
13
14             October 26, 2012
15             9:08 a.m.
16
17       Deposition of CANDACE L. PRESTON,
18   held at the offices of Sidley Austin LLP,
19   787 Seventh Avenue, New York, New York,
20   pursuant to notice, before Cary N. Bigelow,
21   Court Reporter, a Notary Public of the
22   State of New York.
23
24

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

---

Page 2

1  A P P E A R A N C E S:
2
3     FEDERMAN & SHERWOOD
4     Attorneys for Plaintiffs
5          10205 North Pennsylvania Avenue
6          Oklahoma City, Oklahoma 73120
7     BY:  WILLIAM B. FEDERMAN, ESQ.
8
9     SIDLEY AUSTIN LLP
10    Attorneys for Defendants
11         One South Dearborn
12         Chicago, Illinois  60603
13    BY:  JAMES W. DUCAYET, ESQ.
14
15
16
17
18
19
20
21
22
23
24

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

---

Page 3

               STIPULATIONS
       IT IS HEREBY STIPULATED AND AGREED, by
   and among counsel for the respective parties
   hereto, that the filing, sealing and
   certification of the within deposition shall
   be and the same are hereby waived;
       IT IS FURTHER STIPULATED AND AGREED
   that all objections, except as to the form
   of the question, shall be reserved to the
   time of the trial;
       IT IS FURTHER STIPULATED AND AGREED
   that the within deposition may be sworn to
   and signed before any notary public with
   the same force and effect as if signed and
   sworn to before the Court.
                *    *    *

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

---

Page 4

1  C A N D A C E   L.   P R E S T O N, called as a
2     witness, having been duly sworn by a Notary
3     Public, was examined and testified as
4     follows:
5  EXAMINATION BY
6  MR. DUCAYET:
7     Q.   Good morning.
8          Could you please state your name for
9  the record.
10    A.   Candace L. Preston.
11    Q.   Ms. Preston, you've submitted a
12 declaration in this case; is that right?
13    A.   I have.
14    Q.   I have gone ahead and had the court
15 reporter mark as Preston Exhibit 1 a copy of the
16 declaration.
17         (Preston Exhibit 1, declaration of
18    Candace L. Preston in support of plaintiffs'
19    motion for class certification with attached
20    exhibits, production Nos. PRESTON_000001
21    through PRESTON_000069, marked for
22    identification, as of this date.)
23    Q.   Ms. Preston, is that the declaration
24 that you've submitted in this case?

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

Page 9

1  while he was at Princeton Venture?
2  A. I believe so.
3  Q. Let's turn back to the declaration, if
4  we could, Ms. Preston.
5  The declaration is dated June 22nd of
6  this year; is that right?
7  A. Yes, correct.
8  Q. When were you first contacted by anyone
9  from the plaintiffs' side to get involved in this
10 case?
11 A. 2012 for sure.
12 Q. Can you put any more specificity on
13 that?
14 A. No.
15 Q. Was it a couple of months? Was it six
16 months? Was it a couple of weeks? Can you
17 recall?
18 A. It wasn't a couple of weeks and I don't
19 think it was six months.
20 Q. Fair enough.
21 Who first contacted you in connection
22 with this engagement?
23 A. I believe it was Mr. Federman.
24 Q. Do you recall when you were formally

Page 10

1  engaged in this matter?
2  A. I think it was March, now that I -- I'm
3  remembering it was either March or early April,
4  probably.
5  Q. When you were first contacted by
6  Mr. Federman did he describe for you the scope of
7  your proposed engagement?
8  A. I believe so.
9  Q. What do you recall him telling you?
10 A. I believe I recall him saying that he
11 wanted me to look at and see if I was comfortable
12 opining that Broadwind's stock was efficient.
13 Q. Apart from the issue of market
14 efficiency did you and Mr. Federman discuss any
15 other potential opinions that you might render?
16 A. At some point we discussed the issue of
17 the materiality of the disclosure on March 12.
18 Q. Other than market efficiency and
19 materiality did you discuss the possibility of
20 your rendering any additional opinions in this
21 matter?
22 A. No.
23 Q. After you were formally engaged by --
24 by the way, in this conversation that you had

Page 11

1  with Mr. Federman was anyone else on the line?
2  A. Stewart Emmons may have been, and I am
3  -- my memory is not really clear. It may have
4  been I spoke with Mr. Emmons first and then spoke
5  with Mr. Federman all in the same time frame.
6  Q. Who was your -- once you were engaged,
7  who was your sort of primary contact?
8  A. I would say that I had contact with
9  both Mr. Emmons and Mr. Federman.
10 Q. Have you had any contact with anyone
11 from the Robbins Geller firm in this matter?
12 A. Not that I recall.
13 Q. And specifically Joseph Russello, does
14 that name ring a bell?
15 A. You know, there may have been a phone
16 call that he participated in, but I don't recall
17 any specific contact with him.
18 Q. Have you ever done any other work for
19 Mr. Federman or his law firm?
20 A. Yes.
21 Q. On how many occasions?
22 A. Two, I believe.
23 Q. Which two occasions were those? Can
24 you describe those?

Page 12

1  A. One is public where it involves an
2  opinion on some funds that were sponsored by
3  Direxion, D-i-r-e-x-i-o-n; the other is a
4  consulting matter that I will not public
5  acknowledge.
6  Q. The first was Direxion?
7  A. Direxion, yes.
8  Q. Is that a litigation?
9  A. It's a litigation.
10 Q. Do you know where that's pending?
11 A. I don't recall. I am not certain.
12 Q. Is that matter still ongoing?
13 A. Yes.
14 Q. Do you recall what kind of case that
15 was? Was that a 10(b)(5) case, was it a
16 derivative matter?
17 A. It's a Section 11.
18 Q. And Mr. Federman's firm is representing
19 the plaintiffs in that matter?
20 A. Yes.
21 Q. Have you rendered any opinions in the
22 Direxion case?
23 A. Yes.
24 Q. What were the nature of those opinions?

Page 13

1  A. They had to do with the damages
2  suffered by plaintiffs.
3  Q. Did you prepare a report?
4  A. I did.
5  Q. Do you recall approximately when that
6  report was prepared?
7  A. Recently, in the last few months.
8  There were actually, I will tell you, several.
9  Q. Several reports?
10 A. Several reports.
11 Q. Did they all pertain to the issue of
12 damages?
13 A. Yes.
14 Q. Was that in the nature of an initial
15 report and then a rebuttal report?
16 A. Correct.
17 Q. Who was the expert on the defendants'
18 side, if you can recall?
19 A. I don't know.
20 Q. Did you offer any opinions about market
21 efficiency in connection with your opinions in
22 the Direxion case?
23 A. It's a Section 11 case, so it doesn't
24 require market efficiency.

Page 14

1  Q. In connection with the consulting
2  matter, I won't pry into the details, but can you
3  tell me if that is an ongoing matter?
4  A. It is.
5  Q. So apart from the Direxion case and the
6  consulting matter are there any other occasions
7  in which you've been retained by the Federman
8  firm?
9  A. Not to my knowledge. It may be the
10 case that they have been co-counsel on something,
11 but this is the first interaction that I've had
12 with them.
13 Q. In connection with the Direxion matter
14 is Mr. Federman's firm the lead counsel in that
15 for the plaintiffs, do you know?
16 A. I'm not sure.
17 Q. Do you know if there are other firms
18 involved on the behalf of the plaintiffs?
19 A. There are.
20 Q. Have you been working with the Federman
21 firm in connection with the preparation of your
22 opinions?
23     MR. FEDERMAN: In which case?
24 Q. This is in the Direxion matter.

Page 15

1  A. They have certainly been involved.
2  Q. Which other firms are involved in
3  Direxion, if you can recall?
4  A. I believe it's Wolf Haldenstein.
5  Q. Getting back to the Broadwind matter,
6  after your retention did you meet with counsel?
7  A. No, not in person, no.
8  Q. Not in person.
9      Did you have any telephone
10 conversations with them?
11 A. Yes.
12 Q. Approximately how many?
13 A. Maybe four or five.
14 Q. Did you put together a team to work on
15 this engagement after you were retained?
16 A. Yes.
17 Q. Who was the team for financial
18 analysis?
19 A. Cynthia Jones also worked with me.
20 Q. What is Ms. Jones' background?
21 A. She is a -- she's a managing director
22 with our firm and she's an analyst, she has an
23 MBA, she is a chartered financial analyst, she
24 has done various -- she has had various analytic

Page 16

1  jobs, she worked for a hedge fund, and she ran a
2  bridal salon.
3  Q. How long has Ms. Jones worked for
4  Financial Markets Analysis?
5  A. I think her first day was, like, two
6  days before 9/11, so --
7  Q. So over 10 years?
8  A. Yes, eleven.
9  Q. Other than you and Ms. Jones was there
10 anyone else who worked with you on this matter?
11 A. Christine Meyer.
12 Q. Who is Ms. Meyer?
13 A. She is a researcher and an analyst.
14     And probably Tatiana Cpeckova.
15 Q. Is she also a researcher?
16 A. She is.
17 Q. So of the four people -- yourself,
18 Ms. Jones, Ms. Meyer, and Ms. Cpeckova -- what
19 was the allocation of responsibilities in the
20 preparation of the declaration?
21 A. In this case I probably did the vast
22 majority of the work. I worked with Ms. Jones
23 and she would have directed Ms. Meyer and
24 Ms. Cpeckova, but I did most of the work.

Page 37

1  days later when The Wall Street Journal picked it
2  up that the market reacted and it was found to be
3  an efficient reaction.
4     Q.   Is this an opinion that you've offered
5  or --
6     A.   I did not offer that, and I am aware of
7  that, I suppose, because it would have been
8  relevant to another opinion I may have offered,
9  but I don't recall specifically any others that
10 I've offered.
11    Q.   And just to talk about the Louisiana
12 Pacific matter, do you know if that's a situation
13 in which the 10-Q at issue was available to
14 market participants through the EDGAR system?
15    A.   Well, it was filed EDGAR -- I believe
16 it was, you know, because this was certainly an
17 issue in the litigation.
18    Q.   So is it your view that the filing of a
19 10-Q that contains significant unanticipated
20 company-specific news that is filed using the
21 EDGAR system that then takes 10 days before there
22 is a stock price reaction is consistent with an
23 efficient market?
24    A.   I think it's consistent with an

Page 38

1  imperfect efficient market. Nothing that I have
2  ever seen is perfectly efficient, so I think that
3  it is -- you know, and this was a very clear
4  example of a situation where the actual filing or
5  the publication of the information in the Wall
6  Street Journal caused the reaction.
7     Q.   So what do you mean by an imperfect
8  efficient market?
9     A.   I mean there's academic literature that
10 would say there doesn't even have to be a trade
11 that takes place that we can see if we can
12 estimate what the cash flow implications of
13 something would be that we can judge where the
14 price would go, but -- so that would be, like,
15 nirvana, but that ignores real people, that
16 ignores that you might see different implications
17 than I would from the same information, it
18 ignores the fact that sometimes people miss
19 something and it doesn't happen that information
20 is -- that people discover the information as
21 quickly as you would like, it ignores the fact
22 that sometimes there's leakage and the impact
23 actually happens before the information is
24 released publicly, so there are things that make

Page 39

1  markets -- it's what makes markets, that if we
2  all knew in advance everything then there
3  wouldn't be any participation.
4     We all have different opinions.
5  Sometimes it's -- I think we talked about the
6  size of bids and asks and the number of shares,
7  it's one of the reasons at the end of the day
8  that somebody maybe posts an ask that is a
9  hundred percent above the price or something
10 because you don't always know what's going to
11 happen, you can't always check.
12    Q.   And does anything that you just
13 described relate to a distinction between a
14 strong form efficiency and a semi-strong form
15 efficiency?
16    A.   I suppose not.
17    Strong form embodies the idea that the
18 market knows even those things that are inside
19 information. What I'm talking about is -- and so
20 a perfect semi-strong form would react perfectly
21 in a semi-strong manner to publicly known
22 information. I don't think that's the same as
23 strong.
24    Q.   Okay. That's a helpful clarification.

Page 40

1     Let's go back to the Louisiana Pacific
2  situation you described.
3     That's a case, as I understand it,
4  where it would be possible for an investor who is
5  following EDGAR filings by the company to
6  arbitrage for up to 10 days before the
7  information is affecting the stock price; isn't
8  that right?
9     A.   It would be possible for an investor
10 who had that information to trade on that
11 information.
12    Q.   You referenced the order in this case
13 and I think you were referring to a footnote in
14 that order that the judge included relating to
15 the ending point of the class period.
16    Is that what you're talking about?
17    A.   Correct.
18    Q.   Specifically, just so the record is
19 clear, the judge ended the class period not
20 immediately upon the disclosure of what the
21 plaintiffs considered to be corrective
22 information, but he tacked on an extra week; is
23 that right?
24    A.   He added seven days for the market to

Page 41

1  fully absorb the information.
2      Q.   Are you offering any opinion that it
3  would take seven full days for information,
4  material information to be fully incorporated in
5  Broadwind's stock price during this period?
6      A.   No.
7           Could we take a break right now?
8           MR. DUCAYET:  Let's take a short break.
9           (Recess taken.)
10 BY MR. DUCAYET:
11     Q.   Ms. Preston, just to follow up on that
12 last answer that you gave, is it your opinion in
13 this matter that it would take more than a single
14 trading day for material unanticipated company-
15 specific news to be reflected in Broadwind's
16 stock price during the class period?
17     A.   I think there are examples of that, so,
18 yes.
19     Q.   In your view, would it take more than
20 two days for material unanticipated news to be
21 reflected in Broadwind's stock price during the
22 class period?
23     A.   I think it could.
24     Q.   If you could take a look now at

Page 42

1  paragraph 16, in paragraph 16 this section deals
2  with average weekly trading volume during the
3  class period?
4      A.   It does.
5      Q.   And it's your opinion that the average
6  weekly trading volume relative to the number of
7  shares outstanding supports a conclusion that
8  Broadwind stock was trading in an efficient
9  market?
10     A.   I think that is one of the Cammer
11 factors and I think it's satisfied.
12     Q.   You say in paragraph 16 that the
13 turnover as a percentage of average shares
14 outstanding during the class period was 1.8
15 percent.
16          Do you see that?
17     A.   I do.
18     Q.   And that's the average throughout the
19 entire class period; right?
20     A.   That's correct.
21     Q.   Is it also true that the percentage,
22 the turnover as a percentage of average shares
23 outstanding was less than one percent at certain
24 points during the class period?

Page 43

1      A.   May have been.
2      Q.   Now, you know that for a portion of the
3  class period the company was trading on the
4  over-the-counter exchange as opposed to on
5  NASDAQ; right?
6      A.   Yes.
7      Q.   Is it your opinion that the Broadwind
8  stock was trading in an efficient market during
9  the period that it was trading over-the-counter?
10     A.   Yes.
11     Q.   In paragraph 16 you indicate that the
12 turnover as a percentage of the average shares in
13 public hands, i.e., not held by affiliates, was
14 4.5 percent?
15     A.   Correct.
16     Q.   Again, was that true throughout the
17 whole class period?
18     A.   I believe that's the -- yes, throughout
19 the class period calculation.
20     Q.   And do you know whether it was less
21 than that at particular points in time during the
22 class period?
23     A.   Well, the shares in hands not held by
24 affiliates changed with the January offering, so

Page 44

1  it would be different.
2      Q.   Why is the percentage of shares in
3  public hands not held by affiliates, why is that
4  the relevant denominator when looking at the
5  turnover?
6      A.   It's a piece of information.  I think
7  it isn't necessarily a more dispositive piece of
8  information than is the 1.8 percent, but it is a
9  piece of information.  If you are an analyst you
10 like numbers, you like information.
11     Q.   For example, if 99.9 percent of shares
12 were held by insiders or affiliates and only .1
13 percent were actually trading in the public, that
14 would be relevant to the issue of efficiency?
15     A.   It would be a piece of information,
16 sure.
17     Q.   Let's take a look at Exhibit C to your
18 report.
19          MR. FEDERMAN:  What's the Bates number
20     page?
21          THE WITNESS:  28.
22     Q.   Exhibit C is a list of reporting
23 investors holding Broadwind stock between March
24 31, 2009 and March 31, 2010; right?

Page 45

1  A. Correct.
2  Q. Included in this list are both insiders
3  and affiliated investors; right?
4  A. That's correct.
5  Q. So, for example, on page PRESTON 28,
6  number 38 is John Cameron Drecoll, who is a
7  defendant in this case; right?
8  A. Correct.
9  MR. DUCAYET: This will be Exhibit 2,
10  please.
11  (Preston Exhibit 2, two-page printout
12  of Excel file entitled "momentum.xlss,"
13  marked for identification, as of this date.)
14  Q. Ms. Preston, what's been marked as
15  Preston Exhibit 2 and put in front of you is a
16  printout of an Excel file that was provided to us
17  as part of your workpapers, the title of the file
18  was momentum.xlss, and I apologize because the
19  typeface is a little on the small side, but
20  nevertheless, this is a printout of that file.
21  Is that familiar to you?
22  A. It looks like our worksheet, yes.
23  Q. The columns here, you've got on the far
24  left-hand side a list of investor names; right?

Page 46

1  A. That's correct.
2  Q. And then immediately to the right you
3  have a series of columns indicating various
4  points in time during the class period?
5  A. Correct.
6  Q. And those columns indicate whatever
7  position was held by the investor in the far
8  left-hand column on that particular date?
9  A. Correct.
10  Q. And then on the far right-hand column
11  you've got some additional information about the
12  investor, including their investor type, their
13  country, city and mailing address?
14  A. Correct.
15  Q. So let's take a look at the column in
16  the middle that identifies positions as of March
17  31st, 2009.
18  Do you see that?
19  A. Yes, I do.
20  Q. If I'm understanding this correctly, as
21  of March 31st there are 11 investors who are
22  holding positions that were recorded.
23  Does that look right to you?
24  It's a little hard to read.

Page 47

1  A. Yes.
2  Q. And of those, as far as I can tell,
3  only three of them are nonaffiliated investors.
4  A. I have to tell you, that may be.
5  Everything is so small and there's no -- when I
6  look at this on a screen there's a grid so I can
7  follow across, but I wouldn't doubt it, I presume
8  that you actually did look at it someplace and I
9  will accept your representation.
10  Q. Sure.
11  Let me just for the record identify
12  what I believe to be the nonaffiliated entities.
13  It's First Trust Advisors and then,
14  flipping the page over, it's Marquette Asset
15  Management and then Putnam Investment Management
16  LLC, and the others are all either current or
17  former directors or officers or investors such as
18  Tontine.
19  Does the fact that there are only three
20  unaffiliated investors as of the March 31, 2009
21  time frame have any bearing on your opinion that
22  the market for Broadwind stock was efficient at
23  that point in time?
24  A. No. Remember, these are reporting

Page 48

1  investors. We've identified a handful of shares.
2  There were many more shares outstanding that were
3  held by nonreporting individuals, and in fact if
4  somebody had controlled all those shares we would
5  see them as a reporting individual, so, no, that
6  doesn't affect my opinion.
7  Q. Turning back to your report, paragraph
8  17, the last sentence of that paragraph reads
9  "Many of these reporting investors held and
10  traded shares on behalf of individual investors."
11  Do you see that?
12  A. I do.
13  Q. What's the basis for that statement?
14  A. That in fact there are people on here
15  or institutions on here that manage funds or
16  manage individual accounts for investors.
17  Q. Do you know whether any of those
18  reporting investors are index investors that hold
19  the stock in an effort to replicate a particular
20  stock index?
21  A. There may be some that do. Certainly,
22  I mean, we see the fact that when the company is
23  added to the Russell that, in fact, the volume
24  increases dramatically, there is a substantial

Page 49

1  increase in price.
2  Q. We will talk about that in a minute,
3  but just so we're clear, that's because investors
4  who are offering an index fund, for example, are
5  attempting to replicate the basket of stocks that
6  is represented in the index?
7  A. Correct.
8  Q. In that case are investors buying or
9  selling Broadwind stock not in response to
10  company-specific information but in order to
11  maintain whatever the appropriate percentage is
12  in order to replicate the index?
13  A. I don't think motivation has a lot to
14  do with any legal requirement to begin with that
15  I'm aware, but the price shouldn't reflect
16  whether you're an investor replicating an index
17  or an investor who likes green energy or
18  whatever, it should reflect a consensus value.
19  Q. But are index investors, people who are
20  buying and selling in order to replicate an
21  index, are they doing so on the basis of
22  company-specific information?
23  A. Generally their position may be, in a
24  particular stock, is affected by company-specific

Page 50

1  information.
2  Q. But are they themselves buying and
3  selling because of specific information that
4  comes into the market about the company?
5  A. They are buying and selling a specific
6  amount based on that.
7  Q. But are they themselves making any
8  investment decisions based upon their analysis of
9  company-specific information?
10  A. I think if you are replicating an index
11  you are buying a particular member of that index.
12  Now let me just also say lots of funds
13  that are put together to replicate indexes don't
14  buy all the stocks in the index, so there can be
15  a certain amount of judgment based on -- by the
16  fund manager as well, so there are a number of
17  things that go into that decision.
18  Q. But ordinarily you wouldn't expect an
19  index investor to be making purchase or sale
20  decisions based upon company-specific information
21  that may be coming into the market at a given
22  point?
23  A. I don't think you would, that's
24  correct, not whether to purchase or not, but at

Page 51

1  what price and how many shares would be based on
2  company-specific information because that would
3  be reflected in the price of the stock.
4  Q. In other words, they are relying on the
5  market price to reflect the available public
6  information, they are not themselves doing any
7  underlying analysis of what that information is?
8  A. That's correct, that's what I would
9  expect.
10  Q. Let's look at paragraph 20 and this is
11  on the topic of analyst coverage.
12  A. Yes.
13  Q. So paragraph 20 sets forth your opinion
14  that the reports issued by the firms listed and
15  discussed above -- and by above you are referring
16  to paragraph 19 --
17  A. Right.
18  Q. -- constituted adequate coverage of
19  Broadwind and its common stock during the class
20  period and support the assumption of an efficient
21  market for Broadwind stock.
22  Is that your opinion?
23  A. Yes.
24  Q. Now turning to paragraph 19, as I read

Page 52

1  this paragraph, you make a distinction between
2  analysts and research providers on the one hand
3  and research services on the other hand; is that
4  right?
5  A. There is a distinction, yes.
6  Q. Just to be clear, the analysts and
7  research providers that you're talking about are
8  Macquarie Research, JP Morgan and Raymond James;
9  right?
10  A. So those are the analysts that I would
11  be discussing, yes.
12  Q. So we will call those analysts.
13  And then research services are Global
14  Markets Direct, RiskMetrics, Thomson Street
15  Events and Datamonitor; correct?
16  A. Correct.
17  Q. And the research services provide, as
18  you indicate, transcripts and technical data
19  through published reports; right?
20  A. Right. They may include some
21  expectations of what, how the stock will perform
22  on a technical basis.
23  Q. But they don't prepare their own
24  estimates of earnings, for example?

Page 53

1  A. I don't recall any earnings estimates,
2  no.
3  Q. And they don't offer, these research
4  services don't offer any of their own commentary
5  or analysis on the company's performance or its
6  future prospects; right?
7  A. It would be rare.
8  Q. And you didn't see any examples in this
9  case, did you?
10  A. I can't recall any.
11  Q. Let's talk about analysts.
12  Turn to Exhibit D, if you could.
13  What is the Bates number of that?
14  A. 32.
15  Q. Exhibit D is essentially a list of both
16  the analyst and the research services that
17  provided reports on Broadwind during the class
18  period; is that correct?
19  A. That's correct.
20  Q. Now, the first --
21  A. I shouldn't say -- these are the ones
22  that Thomson tracks, so I think -- I'm not sure,
23  for example, if Raymond James is on here or not,
24  but I believe I picked that up through a news

Page 54

1  article or something, so --
2  Q. I didn't see Raymond James on here.
3  Looking at Exhibit D, is it the case
4  that the first instance of an analyst report is
5  Macquarie Research initiating coverage on
6  February 24, 2010?
7  A. Yes.
8  Q. And likewise JP Morgan initiates
9  coverage on March 9, 2010; right?
10  A. Right.
11  Q. And do you recall when Raymond James
12  initiated --
13  A. I don't.
14  Q. Do you have any reason to think it was
15  before February 24, 2010?
16  A. I just don't recall.
17  Q. Going back to your report, one of the
18  factors that you identify as relevant to the
19  efficiency opinion that you are offering is
20  whether or not the company traded on the NASDAQ
21  stock market.
22  Is that right?
23  A. It's something I considered for sure,
24  yeah.

Page 55

1  Q. And the fact that it's trading on
2  NASDAQ is, in your mind, a fact that supports a
3  conclusion of market efficiency?
4  A. Yes. And how it got there supports it
5  as well.
6  Q. We've already discussed this, but it's
7  your opinion that the period prior to its listing
8  on NASDAQ when it was trading over the counter or
9  on the pink sheets is also, in your view, a
10  period when the market was efficient?
11  A. That's correct.
12  Q. And I apologize if I asked you this
13  already, but have you ever offered an opinion
14  that a stock trading over the counter on the pink
15  sheets is trading in an efficient market?
16  A. I don't recall.
17  MR. DUCAYET: I will mark as Preston
18  Exhibit 3 --
19  Q. You're really going to love this one.
20  A. You know, I'm sorry they're so tiny.
21  On the other hand, I appreciate that they are on
22  one page.
23  Q. That's what I was trying to do.
24  MR. FEDERMAN: So this will be Exhibit

Page 56

1  3?
2  MR. DUCAYET: Yes.
3  (Preston Exhibit 3, eight-page printout
4  of portions of an Excel file entitled
5  "regresscomps.xls," marked for
6  identification, as of this date.)
7  Q. Ms. Preston I have given you a document
8  that's been marked as Preston Exhibit 3, let me
9  just describe for you what this is.
10  So among your workpapers was an Excel
11  spreadsheet that was called regresscomps.xls.
12  What I did was to print out a portion
13  of the spreadsheet and the portion that I printed
14  out are all of the columns that get between, on
15  the one hand, in the left-hand column the date
16  and in the right-hand column your test for
17  statistical significance.
18  Do you see that?
19  A. At greater than the 95 percent or,
20  slash, five percent level.
21  Q. And then I'll just represent to you
22  that there are some additional columns in the
23  spreadsheet which essentially report the overall
24  conclusion that flows from the regression that is

Page 73

1 community which may play out in its ability to
2 get financing, if it needed more financing for
3 expansion, it may play out in its acceptance
4 among customers, so there are a lot of those
5 things that kind of all go together to create a
6 value and the stock price reflects that.
7 　　　　Now, it's hard to tell exactly what
8 drives that.
9 　　Q.　　It certainly is not investors'
10 perceptions of the cash flows of the company, the
11 future cash flows of the company; right?
12 　　A.　　But it could be, it certainly could be.
13 　　　　They say, oh, all right, now we're
14 looking at a company, I want to own this company
15 because this company is recognized and it's going
16 to get more business and as a result the cash
17 flows will increase.
18 　　Q.　　But the inclusion on an index or on a
19 stock exchange doesn't provide any information at
20 that time about changes in the company's future
21 cash flows, does it?
22 　　A.　　What it provides is -- let's talk about
23 the inclusion on NASDAQ.
24 　　　　What it actually does is unleash some

Page 74

1 of the value that wasn't formerly available
2 because some people were prohibited from owning
3 the stock, so I think when we look at this
4 Preston 2 we saw a dramatic increase in the
5 number of reporting institutions once the company
6 was included on NASDAQ.
7 　　　　I think that that is exactly the kind
8 of thing where the underlying value -- and when
9 you're talking about future cash flows, those
10 cash flows are discounted.  The discount rate
11 when not as many people can own a stock would be
12 greater.
13 　　　　Once it is -- once the stock is
14 available to more buyers then that discount rate
15 changes and you're still looking at the same,
16 perhaps, cash flow, although maybe you get more
17 recognition, you get more customers, but the
18 discount rate changes and the value reflects a
19 new discount rate.
20 　　Q.　　And that's because as you calculate the
21 current value of future cash flows you are using
22 a different discounting factor?
23 　　A.　　Exactly.
24 　　Q.　　Are you aware of any academic

Page 75

1 literature that suggests --
2 　　　　MR. DUCAYET:  Strike that.
3 　　Q.　　Now, the increase in stock price upon
4 inclusion in an index is a relatively common
5 phenomenon, would you agree?
6 　　A.　　Yes.
7 　　Q.　　Are you aware of any academic
8 literature that suggests that that's actually
9 evidence of market inefficiency as opposed to
10 market efficiency?
11 　　A.　　No.
12 　　　　MR. DUCAYET:  Let's take a short break.
13 　　　　(Recess taken.)
14 BY MR. DUCAYET:
15 　　Q.　　Let's turn to a couple of the dates
16 that you discuss in your declaration beginning at
17 paragraph 38.
18 　　A.　　Yes.
19 　　Q.　　And paragraph 38 in particular
20 discusses information that was disclosed just
21 before the market closed on March 17, 2009.
22 　　　　Do you see that?
23 　　A.　　Correct.
24 　　Q.　　That was an announcement by the company

Page 76

1 of its financial results for the fourth quarter
2 and fiscal year ending December 31, 2008; right?
3 　　A.　　Correct.
4 　　Q.　　And you describe that information as
5 extraordinary news?
6 　　A.　　Yes.
7 　　Q.　　When you say extraordinary, you mean
8 positive?
9 　　A.　　In this case positive, yes.
10 　　Q.　　And that is a function of the fact that
11 the earnings that were reported showed EBITDA
12 increasing by about 40 times?
13 　　A.　　Yes.
14 　　Q.　　So going back to the process you went
15 through looking at dates, this is information you
16 would expect would have a positive price reaction?
17 　　A.　　I would.
18 　　Q.　　Was it your understanding that this was
19 unanticipated positive news?
20 　　A.　　Yes.
21 　　Q.　　And how do you know that?
22 　　A.　　When I look at -- it is my
23 understanding based on the price reaction to
24 begin with, you rarely would see this strong a

Page 77

1 price reaction to something that was
2 unanticipated.
3 　　　　I think there was -- I can't remember
4 if it was Factiva, from the Journal -- a report
5 that came out that said, you know, watch this
6 stock, important movement coming up as a result
7 of this information coming out.
8 　　Q.　　Do you know when that particular report
9 that you're thinking about was issued?
10 　　A.　　I believe it was the morning of the
11 18th.
12 　　Q.　　Do you have any understanding as to why
13 the company was reporting such a significant
14 increase in its EBITDA?
15 　　A.　　I think there were a number of things
16 to do with the acquisition of Brad Foote and I
17 don't remember all the details.
18 　　Q.　　With respect to the acquisition of Brad
19 Foote that was information that the market was
20 previously aware of; right?
21 　　A.　　They were.
22 　　Q.　　And so this is information you expect
23 would be positive and when you looked at your
24 regression you saw that the residual return on

Page 78

1 the next trading day, March 18th, was in fact
2 statistically significant; right?
3 　　A.　　Yes.
4 　　Q.　　And positive?
5 　　A.　　Positive, right.
6 　　Q.　　Let's just take a look at Exhibit 4,
7 the regression.
8 　　A.　　Exhibit 3?
9 　　Q.　　Exhibit 3, thank you.
10 　　　　The fourth date down is March 18th, I'm
11 looking across to the far right-hand column.
12 　　　　As I understand the convention, you set
13 this so that if there was a t-stat that was
14 greater than 1.96 either positive or negative you
15 controlled and put a 1 in the column there?
16 　　A.　　That's correct.
17 　　Q.　　And in fact there is a 1 in that column?
18 　　A.　　That's correct.
19 　　Q.　　And on the day before there was
20 actually a negative price reaction; right?
21 　　A.　　There was.
22 　　Q.　　And that was not statistically
23 significant, though?
24 　　A.　　No.

Page 79

1 　　Q.　　The information that you are referring
2 to in paragraph 38 is a press release; right?
3 　　A.　　That's correct.
4 　　Q.　　And the company, in addition to issuing
5 a press release, also would have filed reports
6 with the SEC; right?
7 　　A.　　Right.
8 　　Q.　　Both the 10-K and then whatever
9 additional information that it was required to
10 file?
11 　　A.　　Correct.
12 　　Q.　　In terms of the issue that you think is
13 significant in terms of the news, the EBITDA
14 information, that's information that would also
15 be included in SEC filings; right?
16 　　A.　　All those were included in the K that
17 was filed.
18 　　Q.　　Are you aware of the fact that the 10-K
19 was actually filed on March 16th?
20 　　A.　　I think late at night on the 16th, as I
21 recall.
22 　　Q.　　Just taking a look at your report,
23 Exhibit E, the first item on Exhibit E shows the
24 filing of three different documents, including

Page 80

1 the 8-K for the fiscal year 2008 on March 16th;
2 right?
3 　　A.　　I think you meant the 10-K.
4 　　Q.　　I did mean the 10-K, thank you.
5 　　A.　　Yes.
6 　　Q.　　The company filed that 10-K online
7 using the EDGAR service?
8 　　A.　　I believe so, yes.
9 　　Q.　　So that was immediately available to
10 investors?
11 　　A.　　It would have been.
12 　　Q.　　That was a full trading day before it
13 issued the press release we have been discussing;
14 right?
15 　　A.　　Yes.
16 　　Q.　　During that full trading day the
17 company actually experienced a decline in its
18 stock price, although not statistically
19 significant; right?
20 　　A.　　That's correct.
21 　　Q.　　To your understanding was there any
22 additional new information that the company
23 included in its press release issued shortly
24 before the market closed on March 17th that was

Page 81

1 not included in the 10-K?
2    A.   Not to my knowledge.
3    Q.   Let's go back to the report.
4        The next date that you examined was the
5 announcement of the listing of the company stock
6 on the NASDAQ Global Select; right?
7    A.   Right. Are you on 16?
8    Q.   Yes, paragraph 39.
9    A.   All right. Yes.
10    Q.   Looking at your regression, that's
11 another day on which there was a statistically
12 significant positive price reaction; right?
13    A.   That's correct.
14    Q.   You describe in here the fact that, as
15 you testified earlier, the fact of the listing on
16 NASDAQ permitted a broader set of investors to
17 own the stock because certain investors are
18 prohibited in one way or another from owning
19 stock that is listed only on the over-the-counter
20 market?
21    A.   That's correct.
22    Q.   And as I understand your testimony,
23 your opinion is that that may -- that fact may be
24 reflective of the underlying cash flows of the

Page 82

1 company in the sense that it may reduce the
2 discount rate that you would apply to the cash
3 flows of the company.
4    A.   Yes, the discounted cash flow, correct.
5        In that context I would also add, as I
6 talk about in the report, that the company went,
7 didn't go just to the NASDAQ level, it went to
8 the NASDAQ level select market.
9        This is another level of vetting that
10 gives investors greater confidence and again is
11 reflected in the discount rate.
12    Q.   So the fact that it went right to the
13 Global Select, in your understanding, would have
14 also reduced -- that fact alone reduced the
15 discount rate?
16    A.   That, in all likelihood, would have
17 done that, yes.
18    Q.   And then paragraph 40 discusses the
19 price reaction in the wake of the announcement
20 that the company was going to be listed on the
21 Russell 3000 index and the Russell 2000 index;
22 correct?
23    A.   Correct.
24    Q.   Then you go on to describe the fact

Page 83

1 that mutual funds, some mutual funds attempt to
2 replicate the performance of these indexes?
3    A.   Correct.
4    Q.   Therefore, this would tend to increase
5 the demand for a company that's now listed on an
6 index; correct?
7    A.   That's correct.
8    Q.   Just so I understand, the issue of the
9 discount rate that we've been talking about in
10 connection with the NASDAQ listing, is that a
11 phenomenon in your view that also occurs when a
12 company is included on an index?
13    A.   It certainly could.
14        I mean, what we're talking about here
15 are informational efficiency issues. The fact
16 that the company -- and that's my understanding
17 of what we are to be testing, so, yeah, the fact
18 that the company is now listed on the NASDAQ has
19 a big impact on its discount rate.
20        The fact that it's included in an index
21 has two different things: number one, it adds to
22 demand and, number two, it can affect its
23 recognition as a company important enough to be
24 included can change the discount rate as well,

Page 84

1 but in either case the rise in the price
2 represents informational efficiency.
3    Q.   Again, just to be clear on this, it
4 doesn't reflect any information about the
5 underlying likely future performance of the
6 company?
7    A.   There are two different kinds of
8 efficiency that you're talking about.
9        Does it change -- it could change the
10 discount rate, it certainly changes the demand
11 and that's reflected in informational efficiency.
12    Q.   With respect to this issue of the
13 change in the discount rate upon either listing
14 on an exchange or inclusion in an index, is there
15 any particular academic literature that one could
16 look at to describe that phenomenon?
17    A.   I can't recall any right now.
18    Q.   And we've already talked about this a
19 little bit, but just, again, so the record is
20 clear, a mutual fund that is attempting to
21 replicate an index would be acquiring or selling
22 the shares of a company within that index
23 regardless of the company-specific news that
24 would be disclosed on a given date; correct?

Page 85

1     A.    I think we've exhausted that.
2     Q.    You agree with me on that?  Is that
3 true?
4     A.    No, but I do believe we've exhausted
5 our separate opinions about that.
6     Q.    Okay.
7     I don't want to beat a dead horse,
8 then, I just want to make sure I am clear on what
9 your opinion is.
10     A.    Let me summarize what I believe I said
11 before.
12     Mutual funds that attempt to replicate
13 indexes do not necessarily include all companies
14 in the index as they attempt to replicate it.
15 They in general try to minimize their transaction
16 costs, so if they can replicate it without
17 purchasing all the companies, they will do that.
18     For example, the S&P 500 has 500
19 companies, generally you can replicate its
20 performance by buying and selling about 20.  So
21 to that extent managers have some discretion in
22 what they buy.  How they exercise that discretion
23 is totally up to them, but in the end how much
24 they buy is determined by the price of the

Page 86

1 particular security, so they are relying on the
2 price which reflects information.
3     Q.    Thank you.
4     The next date that you discuss in your
5 declaration is January 6, 2010.
6     A.    Yes.
7     Q.    The event on that date was the
8 announcement that the company had undertaken a
9 public offering of 15 million shares of its
10 stock?
11     A.    Yes.
12     Q.    There was the potential of an
13 overallotment of another 2.25 million shares?
14     A.    Right.
15     Q.    Was that unanticipated news, in your
16 view?
17     A.    I think it was a much stronger
18 statement than the company had made before.  I
19 think back in October the company had filed a
20 preliminary registration statement.  In this
21 thing they said they had commenced the offering,
22 they identified JP Morgan and Macquarie, and it
23 was a much more definitive statement.
24     I think that after three months had

Page 87

1 elapsed and the market had not seen this, I think
2 it was new information.
3     Q.    Is it your understanding there was some
4 uncertainty in the marketplace as to whether or
5 not this offering would go forward?
6     A.    I think until an offering goes forward
7 there's always some uncertainty.
8     Q.    So this was an indication that whatever
9 uncertainty may have been in the market, that was
10 dispelled as a result of this announcement?
11     A.    I think so, yes.
12     Q.    The company, as you indicated, filed a
13 preliminary registration statement back in
14 October?
15     A.    Yes.
16     Q.    That preliminary registration statement
17 included the number of shares that were going to
18 be offered?  Is that your understanding?
19     A.    I believe it did.
20     Q.    There were subsequent amendments that
21 were made to that registration statement?
22     A.    I believe so.
23     Q.    Are you familiar with that?
24     But if I'm understanding your opinion,

Page 88

1 the fact of a registration statement, preliminary
2 registration statement still conveyed some
3 uncertainty as to whether or not the offering
4 would actually happen or not?
5     A.    I think that's true.  I think that if
6 you are looking at January, when they announce
7 that it's JP Morgan and Macquarie who are leading
8 it, I think that made it a much more definitive
9 move.
10     Q.    You say in paragraph 41 that secondary
11 offerings such as this are generally priced at
12 approximately 10 percent below the market price
13 when they become effective.
14     Do you see that?
15     A.    Yes.
16     Q.    What's the basis for that statement?
17     A.    Years of experience and watching
18 secondary offerings go off.
19     Q.    Do you know if there's any academic
20 literature out there that studies this issue?
21     A.    There probably is.
22     Q.    And is it your understanding that that
23 supports the notion that there's about a 10
24 percent price impact when secondary offerings are

Page 89

1  priced?
2  A. Yes.
3  Q. Do you know when this secondary
4  offering was actually priced?
5  A. Yes. It was priced about two weeks
6  later.
7  Q. January 15th?
8  A. That sounds right.
9  Q. Do you know when the offering closed?
10 A. I think the announcement that the
11 overallotment was taken down comes -- I am not
12 sure of the exact date.
13 Q. So what is the new information about
14 the value of the company that's being disclosed
15 by the announcement on January 6th?
16 A. So the new information is that there's
17 an offering going forward and it's much more --
18 when you put the name JP Morgan on something, JP
19 Morgan generally doesn't do something that
20 doesn't go through, okay, so that gives it a much
21 more definitive likelihood of happening, so the
22 likelihood that it's happening and the market
23 knows that generally investors demand a better
24 return than what the current market price would

Page 90

1  indicate and therefore the price adjusts
2  accordingly.
3  Q. And why is it that you show or see a
4  price decline upon an announcement of a secondary
5  offering?
6  A. Because investors here understand that
7  there will be this offering that will take place,
8  it will be priced 10 percent below the market.
9  Q. So they are assuming the price decline,
10 it's not because they're concerned about dilution,
11 they're just assuming that the way the market
12 will react is there will be a 10 percent
13 reduction?
14 A. Well, there will be dilution, because
15 if it's priced at 10 percent below the market you
16 will be diluted, so that the market tries to come
17 to an equilibrium on that.
18 Q. Does the effect of a secondary market
19 offering have the effect of increasing the public
20 float of the company's stock?
21 A. Yes.
22 Q. Would you expect that to increase the
23 efficiency in the market?
24 A. If the market's already efficient, then

Page 91

1  it adds shares, that's all it does.
2  Q. All things being equal, the more shares
3  that are trading publicly the more likely the
4  market is going to be efficient?
5  A. You know, I think that's asymptotically
6  probably the case, but, you know, are you going
7  to add in a share? Is it going to be more
8  efficient? Are you going to add 10 shares?
9  Q. 15 million.
10 A. In my opinion it was efficient before
11 they added the shares and -- yeah, that's it.
12 Q. I want to understand, though, the
13 rationale for the stock price decline that you're
14 saying occurs whenever there's a secondary
15 offering, that's because current investors are
16 diluted as a result of an offering?
17 A. Because in general to get a secondary
18 offering off the stock has to be priced below the
19 market. That takes into account surprises that
20 might happen overnight between when you go
21 effective and when the stock opens in the
22 morning, it is a typical way that an investment
23 bank would handle a secondary offering.
24       That being the case, if you're going to

Page 92

1  buy on that secondary offering at 10 percent
2  below what I paid today, then I say, well, why am
3  I paying the 10 percent premium and the price
4  adjusts to reflect that, because otherwise you're
5  getting a better deal than I am.
6  Q. And do you know whether or not the
7  price that was set for this offering was at 10
8  percent of what the current market value was?
9  A. I think when it was set it was
10 approximately 10 percent below where it had gone.
11 Q. Where it had gone from where?
12 A. It had dropped significantly between
13 when this came out and when the actual, when the
14 pricing occurred.
15 Q. I think you mentioned the fact that
16 when you were looking at potential events or
17 events that had the potential to result in a
18 statistically significant stock price movement,
19 either positive or negative, that you included
20 earnings releases?
21 A. I did.
22 Q. Other than the release that we've
23 already discussed in March of 2009, did you
24 observe any other instance in which the company's

Veritext Chicago Reporting Company
312-442-9087    800-248-3290    847-406-3200

Page 97

1 Do you see that?
2 A. Yes.
3 Q. -- you offer an opinion on materiality
4 and specifically the materiality of the March
5 12th disclosure?
6 A. Correct.
7 Q. That is a defined term, as I recall, if
8 you go back and look at paragraph 7, the last
9 sentence there defines information released by
10 the company on March 12th, 2010, defined that as
11 the March 12th disclosure?
12 A. Right.
13 Q. And I understand that your opinion is
14 that the information that was disclosed, the
15 March 12th disclosures, as you defined it in your
16 report, in your opinion was material information;
17 correct?
18 A. That's correct.
19 Q. Can you define for me what you mean by
20 materiality?
21 A. Something that would be important to an
22 investor to know.
23 Q. How did you reach your opinion that the
24 March 12th disclosures, as you've defined them,

Page 98

1 is information that an investor would want to
2 know?
3 A. Number one, probably the price reaction
4 was a very important indication and, number two,
5 as I point out, and specifically talking about
6 the disclosures about the intangible assets and
7 goodwill, the company acknowledged that it was
8 the driving force behind the losses.
9 Q. And the price reaction, I understand,
10 is a function of the regression analysis that
11 you've done here and that we've been talking
12 about.
13 What expertise --
14 A. No. The price reaction is a function
15 of the market.
16 Q. The opinion that you've offered with
17 respect to the significance of the price reaction
18 follows from the analysis that you've done in
19 which you determined that there was a
20 statistically significant abnormal return on that
21 day; right?
22 A. Yes, so it's -- the t-statistic is a
23 negative 4.
24 Q. And with respect to the second reason

Page 99

1 why you're offering an opinion on materiality,
2 what expertise do you have with respect to the
3 interpretation of press releases?
4 A. Well, let's start with the
5 interpretation of press releases.
6 It's been my experience through 35 or
7 more years of doing financial analysis that
8 companies put out things that they believe are
9 important to investors or should be important to
10 investors, so that's the reason that a company
11 does a press release.
12 Companies include things that they are
13 either legally obliged to because the law assumes
14 they are important to investors, much as, you
15 know, earnings announcements are required because
16 the law assumes it, but I think if you look at
17 that, just the company's acknowledgment here
18 that, look, we've had terrible results, the
19 fourth quarter intangible charge was largely
20 driven by market conditions causing a revision of
21 management's assessment of future cash flows,
22 that is, you know, we talked about the importance
23 of future cash flows, that's one of the underlying
24 premises of a valuation of a company or its

Page 100

1 stock.
2 So you put that together with those
3 fundamentals, you look at the price decline, and
4 the statistics are certainly part of it, you look
5 at the overall decline and you look at the
6 volume.
7 You know, this isn't 10 shares that are
8 trading, this is almost eight million shares.
9 Those are all things that combined indicate how
10 material this was.
11 Q. And you understand -- I mean, this is
12 an excerpt in paragraph 49 of the press release;
13 right?
14 A. Absolutely.
15 Q. So there was additional information
16 that the company released on March 12th; right?
17 A. It did, yes.
18 Q. And there was also a conference call
19 that it had with investors; right?
20 A. Correct.
21 Q. Have you made any effort to try to
22 allocate the price reaction resulting from any
23 specific component of the information that was
24 disclosed on that date?

Page 101

1  A. Not specifically, not down to the penny
2  or anything.
3       As you can see, there was the 82.2
4  million was, I don't know, about 75 percent of
5  the overall loss, but I haven't done the math or
6  I haven't been asked to do a loss causation
7  calculation like that.
8  Q. You are not offering any opinion on
9  this issue?
10 A. I am not.
11 Q. And you touched on this earlier, but
12 just to close the loop on this, the price
13 reaction that you saw in response to this
14 announcement indicated to you that the market
15 fully incorporated this news within the next
16 trading day; right?
17 A. I thought that was the case, yes.
18      MR. DUCAYET: Let's take a short break.
19      (Recess taken.)
20      (Continued on following page.)

Page 102

1       MR. DUCAYET: Ms. Preston, at this
2  point I have no further questions. Thank
3  you.
4       MR. FEDERMAN: We will read and sign.
5       (Time noted: 11:55 a.m.)
6       _____
7          CANDACE L. PRESTON
8
9  Subscribed and sworn to before me
10 this ___ day of _____, 2012.
11
12 _____
13    NOTARY PUBLIC

Page 103

1       C E R T I F I C A T E
2  STATE OF NEW YORK    )
3                      : ss.
4  COUNTY OF NEW YORK   )
5
6       I, CARY N. BIGELOW, Court Reporter,
7  a Notary Public within and for the State of
8  New York, do hereby certify:
9       That CANDACE L. PRESTON, the witness
10 whose testimony is hereinbefore set forth,
11 was duly sworn by me and that such
12 testimony given by the witness was taken
13 down stenographically by me and then
14 transcribed.
15      I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I am
18 in no way interested in the outcome of this
19 matter.
20      IN WITNESS WHEREOF, I have hereunto
21 set my hand this 29th day of October, 2012.
22
23      _____
24         CARY N. BIGELOW

Page 104

1  ------------------ I N D E X ------------------
2  WITNESS             EXAMINATION BY          PAGE
3  CANDACE L. PRESTON   MR. DUCAYET              4
4
5  ------------------- EXHIBITS ------------------
6  Preston Exhibit 1, declaration of        4
7  Candace L. Preston in support of
8  plaintiffs' motion for class
9  certification with attached exhibits,
10 production Nos. PRESTON_000001 through
11 PRESTON_000069
12 Preston Exhibit 2, two-page printout    45
13 of Excel file entitled "momentum.xlss"
14 Preston Exhibit 3, eight-page printout  56
15 of portions of an Excel file entitled
16 "regresscomps.xls"
17 Preston Exhibit 4, documents bearing    60
18 production Nos. PRESTON_000721 through
19 PRESTON_000726