**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARTHUR L. BRASHER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 11-CV-0991 |
| v. | ) |
| | ) Honorable James B. Zagel |
| BROADWIND ENERGY, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT AND APPROVAL
OF PLAN OF ALLOCATION AND MEMORANDUM OF
<u>POINTS AND AUTHORITIES IN SUPPORT THEREOF</u>**

## TABLE OF CONTENTS

I.        INTRODUCTION AND BACKGROUND ........................................................ 1

II.      REASONS FOR THE SETTLEMENT ................................................................ 2

III.     PROCEDURAL BACKGROUND.................................................................... 4

A.    Procedural Background.................................................................................. 4

B.    Plaintiffs' Substantive Allegations ............................................................... 4

IV.     ARGUMENT ...................................................................................... 6

A.    The Settlement Is Fair, Reasonable, and Adequate and Should Be Approved.................. 6

     1.     Standards Applicable to Review of the Settlement............................... 6

     2.     The Settlement Meets the Substantive Standards for Approval ........................... 8

         a.     The $3,915,000 Recovery Is a Favorable Result In Light of the Best Possible Recovery and All the Attendant Risks of Litigation ................... 8

         b.     The Complexity, Length, and Expense of Further Litigation Support the Approval of the Settlement ...................................................................... 11

         c.     The Reaction of Class Members Supports the Settlement........................ 12

         d.     The Settlement is the Product of Good Faith, Arm's-Length Negotiations Among Experienced Counsel With the Assistance of a Skilled and Respected Mediator ................................................................................. 13

         e.     The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Settlement .................................................................. 14

V.       THE PRO RATA PLAN OF ALLOCATION IS FAIR AND REASONABLE .. 15

VI.     THE NOTICE TO THE CLASS SATISFIES DUE PROCESS........................... 16

VII.     CONCLUSION..................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Air Line Steward & Stewardesses Ass'n., Local 550 v. Trans World Airlines, Inc.*, 630 F.2d 1164 (7th Cir. 1980) ................................................................................................................. 6

*Anderson v. Torrington Co.*, 755 F.Supp. 834 (N.D. Ind. 1991) ................................................... 7

*Anwar v. Fairfield Greenwich Ltd.*, No. 11 Civ. 813, 2012 WL 1981505 (S.D.N.Y. June 1, 2012) ....................................................................................................................................... 13

*Armstrong v. Bd. of Sch. Dirs. City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) .................... 7, 8

*Brotherton v. Cleveland*, 141 F. Supp. 2d 894 (S.D. Ohio 2001) ................................................. 12

*Clarion Corp. v. Am. Home Prods. Corp.*, 494 F.2d 860 (7th Cir. 1974) ..................................... 6

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) ................................................................. 6

*Doan v. Watson*, NA 99-4-C-B/S, 2002 WL 31730917 (S.D. Ind. Dec. 4, 2002) ....................... 13

*Donovan v. Estate of Fitzsimmons*, 778 F.2d 298 (7th Cir. 1985) ............................................. 7, 8

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986) ............................................................................................................................. 8

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ............................................................... 16, 18

*Great Neck Capital Appreciation Inv. P'ship, L.P., v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400 (E.D. Wis. 2002) .......................................................................................... 7, 11, 15

*In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418 (S.D.N.Y. 2001) ........................ 10

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL 1500, 02 Civ. 5575, 2006 U.S. Dist. LEXIS 17588 (S.D.N.Y. Apr. 6, 2006) ................................................................................. 14

*In re Datatec Sys., Inc. Sec. Litig.*, No. 04-cv-525, 2007 WL 4225828 (D.N.J. Nov. 28, 2007) . 16

*In re Excess Value Ins. Coverage Litig., 2004-2 Trade Cash. (CCH) P74, 521*, No. M-21-84 (RMB), (MDL-1339), 2004 U.S. Dist. LEXIS 14822 (S.D.N.Y. July 30, 2004) .................... 15

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) ........................................................................................................................ 7, 13

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) 12

*In re Warner Commc'ns Sec. Litig.*, 618 F.Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ................................................................................................................................ 11

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) .................................................................... 7, 8, 11, 13

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987) ................. 7

*Meyenburg v. Exxon Mobil Corp.*, No. 3:05-cv-15, 2006 WL 5062697 (S.D. Ill. June 5, 2006)  12

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................................. 17

*White v. Nat'l. Football League*, 822 F. Supp. 1389 (D. Minn. 1993) ......................................... 16

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910) ................................................................. 6, 14

*Williams v. Rohm & Haas Pension Plan*, No. 4:04-CV-0078, 2010 WL 1490350 (S.D. Ind. Apr. 12, 2010) ..................................................................................................................... 13

## **Other Authorities**

2 Newberg on Class Actions §11.48 (3d ed. 1992) ...................................................... 12

## **Rules**

Fed. R. Civ. P. 23(c)(2) ................................................................................................ 16

Fed. R. Civ. P. 23(e) ...................................................................................................... 6

## **Regulations**

Section 21 D of the PSLRA, 15 U.S.C. § 78u-4(e)(I) ................................................. 16

Lead Plaintiff[1] Brian M. Grothues ("Lead Plaintiff" or "Plaintiff"), by and through his undersigned counsel, hereby moves this Court for final approval of the Settlement, the Plan of Allocation, and entry of the Final Judgment and Order of Dismissal With Prejudice. In connection with the Motion, Lead Plaintiff submits the incorporated Memorandum of Law in Support.

## I.  INTRODUCTION AND BACKGROUND

Lead Plaintiff and his counsel, Federman & Sherwood ("Lead Counsel"), respectfully submit that the proposed $3.915 million Settlement of this class action (the "Litigation"), which alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, easily satisfies all of the relevant standards for final approval under Federal Rule of Civil Procedure 23.[2]

The Settlement resulted from intensive arm's-length negotiations that included two day-long mediation sessions with the Honorable Wayne R. Andersen, Retired Judge of the United States District Court for the Northern District of Illinois. Although the mediation sessions did not resolve the Litigation, they prompted additional discussions that, with Judge Andersen's continued assistance, ultimately resulted in the proposed Settlement.

---

[1] This Court initially appointed Jerry Pehlke, Jr. ("Pehlke") as Lead Plaintiff and approved his selection of Lead Counsel and Liaison Counsel, James T. Crotty & Associates, by Order dated July 7, 2011. On November 26, 2012, the Court granted Pehlke's Motion to Withdraw as Lead Plaintiff (Dkt. No. 116). For purposes of this Settlement only, Plaintiff Brian M. Grothues ("Grothues") and Defendants Broadwind Energy, Inc. ("Broadwind" or the "Company") and J. Cameron Drecoll ("Drecoll"), the Company's former Chief Executive Officer (collectively the "Parties"), have agreed, subject to the approval of this Court, that Grothues should be appointed Lead Plaintiff. On March 14, 2013, the Court preliminarily approved the Settlement, certified the Settlement Class for the purposes of effectuating the Settlement, and appointed Grothues as Lead Plaintiff and class representative (Dkt. No. 133).

[2] All capitalized terms not defined herein have the meaning set forth in the Stipulation of Settlement, dated March 6, 2013 (the "Stipulation"), filed with the Court on March 11, 2013 (Dkt. No. 130), and preliminarily approved by the Court's March 14, 2013 Order (Dkt. No. 133).

The Settlement also reflects a reasoned and fully-informed compromise based on Lead Plaintiff's and Lead Counsel's knowledge of the strengths and weaknesses of the case gained through an extensive pre-complaint investigation, motion practice, voluminous discovery, and consultations with experts. *See* Declaration of William B. Federman in Support of (1) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation of Settlement Proceeds; and (2) Lead Plaintiff's Motion for an Award of Attorneys' Fees, and Reimbursement of Litigation Expenses ("Federman Declaration") at ¶¶15-27, 33-42. After extensive notice and an opportunity for Class Members to request exclusion or object, to date only one Class Member out of potentially tens of thousands has opted out, and no Class Members have objected to the Settlement, the Plan of Allocation, the request for attorneys' fees and reimbursement of expenses, or the request for a reimbursement award to Lead Plaintiff.

By all measures, the Settlement provides a fair and reasonable recovery for the Class.

## II.    REASONS FOR THE SETTLEMENT

The principal reason for the Settlement is the significant benefit it provides to the Class now. This benefit must be weighed against the risk that the Class would receive a much smaller recovery, or no recovery at all, had Lead Plaintiff elected to continue litigating through the class certification, summary judgment and trial phases, and inevitable appeals, to say nothing of the years of delay that such continued litigation would cause.

Lead Plaintiff's decision to settle this matter was informed by a thorough understanding of the strengths and weaknesses of the claims and defenses in the Litigation, gained through extensive and rigorous investigation and prosecution of this matter. In assessing whether the Settlement is in the best interests of the Class, Lead Plaintiff and Lead Counsel evaluated, among other things: (i) the cash benefit to Class Members under the terms of the Settlement; (ii) the possibility that the Court would not certify (or would severely curtail) Lead Plaintiff's proposed

2

class; (iii) the likelihood of defeating Defendants' summary judgment motion and any *Daubert* motion, and ultimately prevailing at trial; (iv) the delays inherent in such litigation, including appeals; and (v) the uncertainty of whether Lead Plaintiff could prove damages and in what amount, even assuming that Lead Plaintiff could establish Defendants' liability.

Although Lead Plaintiff alleged that Defendants materially misrepresented Broadwind's financial position and omitted material adverse information in violation of the federal securities laws, Defendants have raised a host of factual and legal challenges increasing the uncertainty of a favorable outcome absent settlement. Securities claims are notoriously complex and difficult to prove, and this case is no exception to the general rule. By settling the Litigation now, Lead Plaintiff and the Class can avoid the risks of further litigation and share in what Lead Plaintiff and Lead Counsel believe is a substantial cash recovery and favorable result for the Class.

Lead Plaintiff and Lead Counsel respectfully submit that the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Class. At a minimum, the Settlement appropriately balances the substantial risks, costs, and delays inherent in complex cases, falls within the range of reasonableness, and thus warrants judicial approval. The Settlement provides significant all-cash compensation for the Class and eliminates the genuine and significant risk that continued litigation may result in a smaller recovery or possibly no recovery at all.

The proposed Plan of Allocation provides that claimants are to recover *pro rata* from the Net Settlement Fund based on their "Recognized Losses," as that term is defined in the Plan of Allocation. Thus, the proposed Plan of Allocation will fairly allocate the Net Settlement Fund among the Class Members who timely submit valid Proofs of Claim in proportion to their Recognized Losses.

For all the reasons discussed more fully below, Lead Plaintiff and Lead Counsel respectfully request that the Court grant the motion for final approval of the proposed Settlement and the proposed Plan of Allocation.[3]

## III.  PROCEDURAL BACKGROUND

### A.  Procedural Background

The Federman Declaration, which accompanies this memorandum, sets forth in detail the factual and procedural background of this case and the events that led to the Settlement.

### B.  Plaintiffs' Substantive Allegations

The factual allegations in the Litigation have been set forth at length in the Amended Complaint for Violation of Federal Securities Laws (the "Complaint") filed by Arthur L. Brasher, Pehlke and Grothues (collectively "Plaintiffs") on September 13, 2011 (Dkt. No. 41). Plaintiffs alleged claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 thereunder, on behalf of purchasers of the publicly traded common stock of Broadwind Energy, Inc. ("Broadwind" or the "Company") during the period from March 16, 2009 through August 9, 2010, inclusive (the "Class Period").

Broadwind is a provider of products and services to the U.S. wind energy industry. Plaintiffs alleged that, beginning by at least the fourth quarter 2008, the demand for products of Broadwind's two largest customers, General Electric Co. ("GE") and Clipper Windpower ("Clipper"), began to substantially decline. Plaintiffs alleged that, by as early as mid-November 2008, GE and Clipper significantly and continually cut their order forecasts, with one confidential informant estimating that forecasts from GE and Clipper declined by 75% from

---

[3] Concurrently, Lead Plaintiff has filed a motion for approval of attorneys' fees and reimbursement of litigation expenses together with a supporting memorandum of law.

November 2008 to July 2009. Plaintiffs alleged that Defendants failed to disclose the adverse news of GE's and Clipper's lowered order forecasts or to account for the impairment of Broadwind's goodwill and intangible assets as a result of the substantially lowered forecasts. The Complaint alleged that Defendants: (i) ignored specific "triggering" events and circumstances prior to and throughout the Class Period, which required interim impairment analyses of the Company's intangible assets and goodwill; (ii) delayed performing the Company's annual impairment review of goodwill, which was scheduled to occur in October 2009; and (iii) delayed reporting the impairment charge.

Plaintiffs asserted that the delay in impairment testing and reporting allowed Broadwind to complete its secondary public offering in January 10, 2010, in which it sold 15 million shares of common stock to the public at $5.75 per share, raising more than $86 million in proceeds. In addition, Plaintiffs alleged that the delay in testing and reporting allowed Defendant Drecoll to sell 1,125,000 of his personally held shares for net proceeds of over $6 million.

Not until March 12, 2010 did the Company finally disclose the $82.2 million impairment charge to goodwill and intangible assets that it took for the fourth quarter of 2009. The Complaint alleged that the disclosure of this news had an immediate adverse impact on the Company's stock price, causing substantial losses to Class Members.

Defendants countered Plaintiffs' allegations by arguing, *inter alia*, that: (i) Defendants never made a material misrepresentation or omission but instead issued meaningful disclosures that customers had "scaled back existing manufacturing orders" and "delayed new projects and service arrangements"; (ii) certain statements were not actionable pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") because they were forward-looking and accompanied by meaningful cautionary information; and (iii)

Plaintiffs did not sufficiently allege and would not be able to prove that Defendants acted with fraudulent intent. In particular, Defendants cited to *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990), to argue that a dispute over the timing of an accounting write-down cannot serve as a basis for fraud. Further, Defendants argued that to prove fraudulent intent with respect to Broadwind's accounting errors, Plaintiffs would need to establish that Defendants did not believe in their statements of opinion regarding the value of Broadwind's goodwill and intangible assets at the time the statements were made.

On April 19, 2012, the Court granted in part and denied in part Defendants' motions to dismiss (Dkt. No. 84). Finding that Plaintiffs had not alleged with sufficient particularity how statements made after March 12, 2010 were misleading, the Court shortened the Class Period "to run from March 16, 2009, the date Broadwind filed its Form 10–K for the year ending December 31, 2008, to March 19, 2010, one week after Broadwind filed its 2009 Form 10–K announcing the $82.2 million charge to goodwill and other intangible assets." *Id.* at 12. The Court further held that "Plaintiffs' claim that Broadwind and Defendant Drecoll engaged in deceptive practices with regards to the timing of the impairment write-down survives." *Id.* at 25. All other claims were dismissed with prejudice, including claims against the Dismissed Defendants. *Id.* at 11-12, 25.

## IV. ARGUMENT

### A. The Settlement Is Fair, Reasonable, and Adequate and Should Be Approved

#### 1. Standards Applicable to Review of the Settlement

"Compromises of disputed claims are favored by the courts." *Clarion Corp. v. Am. Home Prods. Corp.*, 494 F.2d 860, 863 (7th Cir. 1974) (citing *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910)). This policy is particularly strong where complex class action litigation is concerned. *Air Line Steward & Stewardesses Ass'n., Local 550 v. Trans World Airlines, Inc.*,

630 F.2d 1164, 1166-67 (7th Cir. 1980). Although the parties to the Litigation believe they have reached a just compromise, Fed. R. Civ. P. 23(e) requires court approval for settlement of a class action. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

Settlement approval requires only that the Court be satisfied that the parties' agreement is lawful, fair, reasonable, and adequate to the class. *See Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 307-08 (7th Cir. 1985); *Isby*, 75 F.3d at 1196 ("inquiry is limited" to these considerations). A strong presumption of fairness exists when the settlement is the result of extensive arm's-length negotiations. *See Great Neck Capital Appreciation Inv. P'ship, L.P., v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002); *Anderson v. Torrington Co.*, 755 F.Supp. 834, 838 (N.D. Ind. 1991). Similarly, deference should be given to the opinion of experienced counsel who have handled the matter and are best suited to evaluate the case's strengths and weaknesses. *Armstrong v. Bd. of Sch. Dirs. City of Milwaukee*, 616 F.2d 305, 315 (7th Cir. 1980). Consequently, a court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001). Nor should a court substitute its own judgment of fairness and adequacy for that of the litigants and their counsel or transform settlement approval proceedings into a mini-trial on the merits. *See Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987); *Armstrong*, 616 F.2d at 314-15 (7th Cir. 1980). Rather, courts should view settlements in their entirety and consider the facts "in the light most favorable to the settlement." *Isby*, 75 F.3d at 1199.

As explained below, when examined under the applicable criteria, the Settlement is a

favorable result for the Class. It achieves an immediate and substantial recovery and is unquestionably superior to the possibility that, were this litigation to proceed to trial or subsequent appeal, there may be no recovery at all.

### 2. The Settlement Meets the Substantive Standards for Approval

In assessing a proposed settlement's fairness, reasonableness, and adequacy, a court should examine: (1) the strength of the plaintiffs' case compared to the amount of the defendants' settlement offer; (2) an assessment of the likely complexity of the litigation; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement. *Isby*, 75 F.3d at 1199. Each of these factors weighs in favor of final approval of the Settlement.

### a. The $3,915,000 Recovery Is a Favorable Result In Light of the Best Possible Recovery and All the Attendant Risks of Litigation

The first factor -- comparing the strength of plaintiffs' claims against the benefits of the settlement -- is a particularly important consideration. *See, e.g., E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986); *Armstrong*, 616 F.2d at 314. The $3.915 million Settlement represents a recovery of 17.6% of Plaintiffs' expert's conservative estimate (of $22.2 million) of damages, and 10.9% of Plaintiffs' expert's most liberal estimate (of $35.8 million) of damages. Federman Declaration at ¶42. This recovery is more than the median settlement recovery of 10.2% of investor losses in securities class actions with investor losses, as here, ranging from $20 million to $49 million. *Id.*; *see NERA, Flash Update: 2012 Trends in Securities Class Actions,* at 29, Figure 29, Exhibit 3 to the Federman Declaration. Thus, the value of the Settlement in relation to Class-wide estimated losses is favorable to the Class.

Moreover, the Settlement is appropriate at this time in light of the sheer complexity of the claims and defenses in this Litigation. See *Donovan*, 778 F.2d at 309 ("[A]n integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation."). The parties have disagreed throughout the litigation on a number of key factual and legal issues, including, among other things, the difficulty of establishing that "Defendants delayed reporting the results of their annual October goodwill impairment tests in order to keep stock prices inflated through the January 2010 public offering" – a crucial issue that the Court identified in partially denying dismissal. Memorandum Opinion and Order (Dkt. No. 84) at 38.

Lead Plaintiff and Lead Counsel also considered the possibility, based on evidence developed in discovery and the mediation discussions, that the "failure to detect [the] massive impending write-down was the result of negligence." *Id*. at *42. In fact, the documents obtained in discovery did not uniformly support Lead Plaintiff's theory of liability, and a challenge to establishing liability remained that impairment testing at Broadwind began in the fourth quarter of 2009 and continued through part of the first quarter of 2010, with no impairment concerns noted by Broadwind's outside auditor or valuation firm. Federman Declaration at ¶39. In fact, Defendants cited evidence suggesting that immediately prior to the offering Broadwind, Broadwind's auditor, and Broadwind's valuation firm were unaware of any impairment issues. *Id.* Further, it appears that Broadwind first received a draft of the valuation firm's report suggesting that an impairment write-down was needed on February 10, 2010, a few weeks after the offering. *Id.*

The parties also sharply disagreed as to the amount of damages and loss causation with respect to those damages, with Defendants citing studies by consulting firms and academics

9

finding minimal stock price declines were typical in reaction to impairment announcements. *Id.* Thus, Defendants strongly asserted that the majority of the Class's claimed damages were caused by other factors, including Broadwind's contemporaneous announcement of disappointing earnings, even absent the impairment charge, and a pessimistic outlook for the remainder of the year. *Id.*

Finally, at the time of the mediation and settlement, Plaintiffs' motion for class certification was pending – although Plaintiffs' financial expert opined that Broadwind common stock traded in an efficient market throughout the Class Period – the Parties disagreed as to whether the market for Broadwind stock was efficient, particularly in the earlier parts of the Class Period. *Id.*

Thus, at the time the case settled, there was considerable uncertainty regarding the future trajectory of the Litigation. Although Lead Plaintiff believes a class could properly be certified, the Court's decision on the issue was uncertain given the complexities of the issues raised. Even assuming Plaintiffs' class certification motion was granted, additional issues relating to damages and loss causation would require extensive expert discovery and testimony, adding considerably to the complexity, expense and duration of the Litigation and calling on the jury to determine a "battle" of the experts. Moreover, Plaintiffs would have to overcome any motion for summary judgment that Defendants would likely file. Thus, there was considerable risk that the Court would reject Plaintiffs' argument that Defendants acted with the fraudulent intent and could be liable for all of the alleged losses. Ultimately, even if the Court granted Plaintiffs' motion for class certification and denied Defendants' anticipated motion for summary judgment, Plaintiff would need to prevail at trial. In the battle of competing witnesses, credibility toss-ups would be decided by the jury. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426

(S.D.N.Y. 2001). Accordingly, even if the Class were successful, the verdict might not survive post-trial motions or appeal.

While Lead Plaintiff has confidence in his claims, in light of the many hurdles between the current stage and a final appeal of any judgment in favor of the Class, the $3.915 million Settlement is a favorable result. Moreover, it could have been many years before Class Members received any benefit (if at all) from the Litigation. Providing a recovery now, instead of years down the line, increases the value of the Settlement to the Class.

> **b.** **The Complexity, Length, and Expense of Further Litigation Support the Approval of the Settlement**

When evaluating a settlement, a court must consider "the likely complexity, length, and expense of the litigation." *Isby*, 75 F.3d at 1199. "Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted." *Great Neck Capital*, 212 F.R.D. at 409.

Lead Counsel has considerable experience in securities fraud class actions and are intimately familiar with the path such cases typically follow. Federman Declaration at ¶¶59-61, and Exhibit 4. For the Litigation to continue to trial, Plaintiffs would have to obtain class certification, conduct substantial merits and expert discovery, and defeat motions for summary judgment. The trial itself would have lasted several days and involved numerous attorneys, witnesses, experts, and the introduction of a voluminous amount of evidence. Motions for a new trial and/or an appeal would likely follow any verdict rendered at trial.

Even if the Class could ultimately recover a larger judgment, this possibility must be weighed against years of additional expense and delay, fraught with risk at every stage. *See In re Warner Commc'ns Sec. Litig.*, 618 F.Supp. 735, 747-48 (S.D.N.Y. 1985) (so holding and noting that an appeal "could seriously and adversely affect the scope of an ultimate recovery, if not the

recovery itself"), *aff'd*, 798 F.2d 35 (2d Cir. 1986). Consequently, where "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court," the recovery of a substantial sum certain weighs in favor of the Settlement. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998).

### c. The Reaction of Class Members Supports the Settlement

Courts consider the reaction of the Class when determining whether to approve a settlement. *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001). A "relatively small number" of objections, is "an indication of a settlement's fairness." *Id.* (citing 2 Newberg on Class Actions §11.48 (3d ed. 1992)); *see also Meyenburg v. Exxon Mobil Corp.*, No. 3:05-cv-15, 2006 WL 5062697, at *6 (S.D. Ill. June 5, 2006) (nine objections is a "minuscule" amount).

As of May 23, 2013, the Notice had been mailed to over 20,000 potential Class Members and their nominees, advising them of the proposed Settlement and Plan of Allocation, and the request for an award of attorneys' fees and expenses. The Notice further advised Class Members of their rights to object or exclude themselves from the Class and the deadline for doing so. *See* Sincavage Aff. at ¶15. Additionally, a Summary Notice was published on April 3, 2013, in *Investor's Business Daily* and on the *PR Newswire*. *Id.* at ¶14. On April 3, 2013, the Notice, Proof of Claim, and Stipulation of Settlement were made available on the Claims Administrator's website, and a toll-free phone number was set up to accommodate any questions from potential claimants. *Id.* at ¶¶11-12.

While the time for objections has not expired, the Settlement enjoys overwhelming support to date. In fact, not a single Class Member has objected, and only one Class Member, out of the more than 21,000 Class Members who were mailed Notice, has requested exclusion. *See id.* at ¶15. Thus, the reaction of the Class weighs heavily in favor of approving the

Settlement.

> **d.    The Settlement is the Product of Good Faith, Arm's-Length Negotiations Among Experienced Counsel With the Assistance of a Skilled and Respected Mediator**

Approval of a settlement is favored if it is "clearly and fairly arrived at through arms-length negotiations between and among some exceptionally talented attorneys, with help from some equally experienced and talented mediators." *See Williams v. Rohm & Haas Pension Plan*, No. 4:04-CV-0078, 2010 WL 1490350, at *4 (S.D. Ind. Apr. 12, 2010); *Doan v. Watson*, NA 99-4-C-B/S, 2002 WL 31730917, at *1 (S.D. Ind. Dec. 4, 2002). The opinions of the attorneys who negotiated the deal are entitled to significant weight in determining whether a settlement is reasonable. *See, e.g., Isby*, 75 F.3d at 1200; *In re Mexico Money*, 164 F. Supp. 2d at 1020.

Here, Lead Counsel have many years of experience in litigating securities class actions, and have negotiated many other class action settlements which have been approved by federal and state courts across the country. *See* Federman Declaration at ¶59, and Exhibit 4.A. Liaison Counsel and additional Plaintiffs' Counsel are well qualified as well. *Id.* at ¶60. Moreover, Defendants were represented by skilled and well-respected counsel from Sidley Austin LLP, one of the most prominent defense firms with a well-deserved reputation for vigorous advocacy in the defense of complex civil cases. Throughout the Litigation, Defendants' counsel litigated aggressively and unfailingly. Courts have recognized that the caliber of the opposition faced by plaintiffs' counsel should be taken into consideration in assessing the quality of the plaintiffs' counsel's performance, and in this case it supports approval of the requested fee. *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, No. 11 Civ. 813, 2012 WL 1981505, at *2 (S.D.N.Y. June 1, 2012).

Moreover, Judge Andersen facilitated the resolution of this Litigation based on his assessment of the factual record presented by the Parties during mediation. Specifically, the

Parties submitted lengthy mediation materials explaining the respective positions on liability and damages and participated in two day-long mediation sessions under the guidance of Judge Andersen in an effort to achieve an early resolution of the case. *See* Declaration of Wayne R. Anderson in Support of Final Approval of the Settlement and Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Expenses, attached as Exhibit 1 to the Federman Declaration. The first mediation session was held on August 20, 2012, in Chicago, Illinois. *Id.* Although the mediation did not yield a resolution, the parties continued to discuss settlement negotiations and ultimately agreed to participate in a second mediation session on January 18, 2013. *Id.* Several days after the second mediation session -- an entire day of face-to-face, robust discussions between Judge Anderson and the Parties -- Judge Andersen presented a "mediator's proposal" to accept or reject based on his objective views of the case. *Id.* On January 23, 2013, the Parties agreed to accept Judge Andersen's proposal of settling the Litigation for $3.915 million. The Stipulation of Settlement was finalized on March 11, 2013. *See* Dkt. No. 130. That the Settlement is the result of lengthy, arm's-length negotiations supports its approval.

> **e.** **The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Settlement**

To ensure access to sufficient information to evaluate both the merits of the case and the adequacy of the settlement proposal, courts in this Circuit take into consideration the stage of the proceedings and the amount of discovery completed. *Williams*, 2010 WL 1490350, at *7; *see In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL 1500, 02 Civ. 5575, 2006 U.S. Dist. LEXIS 17588, at *36-*37 (S.D.N.Y. Apr. 6, 2006) ("The relevant inquiry . . . is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.").

14

Here, Lead Plaintiff and Lead Counsel entered into the Settlement with a full understanding of the Litigation's strengths and weaknesses. That understanding was derived from Plaintiffs' Counsel's effort in the Litigation, which included among other things: (1) a comprehensive, intensive, and independent pre-filing investigation, including interviewing numerous former employees of Broadwind; (2) the filing of the Complaint; (3) preparing and filing extensive briefing in opposition to Defendants' motions to dismiss; (4) propounding and serving extensive discovery on Defendants and numerous third-parties; (5) reviewing and analyzing over 234,000 pages of documents and data; (6) retaining and consulting with damages and market efficiency financial experts; (7) preparing for and defending the depositions of Lead Plaintiff and Plaintiffs' financial expert; (8) briefing a motion for class certification, which included the submission of supporting expert reports and analyses; (9) preparing a detailed mediation statement; and (10) participating in two separate mediation sessions with Judge Andersen and subsequent negotiations. Thus, the late stage of the Litigation and the amount of discovery completed to date heavily favor of the Settlement.

Given the foregoing, Lead Counsel was extremely knowledgeable of the relevant issues, strengths and weaknesses of the Litigation, and had abundant information to intelligently negotiate the terms of the Settlement. *See In re Excess Value Ins. Coverage Litig., 2004-2 Trade Cash. (CCH) P74, 521*, No. M-21-84 (RMB), (MDL-1339), 2004 U.S. Dist. LEXIS 14822, at *40 (S.D.N.Y. July 30, 2004) ("The investigation, discovery, and motion practice conducted to date provide Plaintiffs with sufficient information to make an informed judgment on the reasonableness of the settlement proposal.") (internal quotation marks and citation omitted).

## V.     THE *PRO RATA* PLAN OF ALLOCATION IS FAIR AND REASONABLE

A court's evaluation of a plan of allocation in a class action is governed by the same standards of review applicable to the settlement as a whole: the plan must be fair and reasonable.

*See Great Neck Capital*, 212 F.R.D. at 184; *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992). An allocation formula must only have a reasonable, rational basis, particularly if recommended by "experienced and competent" plaintiffs' counsel. *White v. Nat'l. Football League*, 822 F. Supp. 1389, 1420 (D. Minn. 1993). Because they tend to mirror the complaints' allegations, "plans that allocate money depending on the timing of purchases and sales of the securities at issue are common." *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-cv-525, 2007 WL 4225828, at *5 (D.N.J. Nov. 28, 2007).

Here, the Plan of Allocation was developed by Plaintiffs' Counsel's damages experts, and it reflects an assessment of the damages that could have been recovered under the theories asserted in the Complaint. In particular, damages are calculated based upon the timing of stock purchases and sales, giving effect to the removal of artificial inflation from the stock price when the alleged material misrepresentations were revealed to the market and the risks allegedly concealed by Defendants materialized, to Broadwind's shareholders' detriment. *See* Federman Declaration, at ¶¶43-46. Consequently, the Plan of Allocation will result in an equitable distribution of the proceeds among all Class Members who submit valid claims, which comports with Section 21 D of the PSLRA, 15 U.S.C. § 78u-4(e)(I). *Id.* Lead Plaintiff and Lead Counsel submit that the Plan of Allocation is a fair and reasonable method for allocating the Net Settlement Fund among the members of the Class.

## VI.     THE NOTICE TO THE CLASS SATISFIES DUE PROCESS

The Notice program provides the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (quoting Fed. R. Civ. P. 23(c)(2)). In accordance with the Preliminary Approval Order, the Claims Administrator Heffler Claims Group ("Heffler") caused the Court-approved Notice and Proof of Claim forms to be mailed by

first class mail, postage prepaid to more than 21,000 potential Class Members. Sincavage Aff. ¶¶2-10; *see also* Federman Declaration at ¶¶28-32. As of May 23, 2013, Heffler has disseminated a total of 21,824 Notice packets to potential Class Members and/or their nominees. Sincavage Aff. ¶¶2-10.

On April 3, 2013, the Court-approved Summary Notice was published in *Investor's Business Daily* and issued electronically over *PR Newswire*. *Id.* at ¶14. The Notice and Proof of Claim, along with other important documents related to the Settlement, were also posted on the Claims Administrator's website www.BroadwindSettlement.com (the "Website") for easy downloading by interested investors. *Id.* The Website includes an email link that allows Class Members to obtain information about the Settlement, request a Notice packet, and/or seek assistance from Heffler with their claims. *Id.*

Heffler also established a toll-free telephone hotline with live operators available to assist potential Class members with questions about the Settlement. *Id.* As of the date of the Sincavage Affidavit, Heffler has received 33 telephone calls. *Id.*

Moreover, as is required in class actions, the Class has been given notice of the proposed Settlement and Plan of Allocation, as well as the rights of Class members and the method and dates by which they can object to, or opt-out of, the Settlement, and/or object to the requested award of attorneys' fees and expenses and the Lead Plaintiff's requested reimbursement award. *Id.* at ¶15. Further, the Class has been advised of the date of the final fairness hearing, at which time they will have an opportunity to be heard with respect to any objection raised. Federman Declaration at ¶30; *see also* Exhibit A to Sincavage Aff.

Lastly, the notice procedures utilized in this case – publication and direct mail – were "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

17

of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted). Thus, the method of notice described above satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process. *See Eisen*, 417 U.S. at 173.

## VII. CONCLUSION

For the reasons set forth above and in the accompanying submissions, Lead Plaintiff respectfully requests that the Court approve the Settlement in its entirety and enter the Final Judgment and Order of Dismissal with Prejudice.

Dated: May 28, 2013                     Respectfully submitted,

s/William B. Federman
William B. Federman
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

*Lead Counsel for Plaintiffs*

James T. Crotty
JAMES T. CROTTY & ASSOCIATES
208 S. LaSalle St., Suite 1750
Chicago, IL 60604
Telephone: (312) 623-1599

*Liaison Counsel for Plaintiffs*

Samuel H. Rudman
Joseph Russello
Andrea Y. Lee
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that on May 28, 2013, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

s/William B. Federman