**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARTHUR L. BRASHER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 11-CV-0991 |
| v. | ) |
| | ) Honorable James B. Zagel |
| BROADWIND ENERGY, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES AND
REIMBURSEMENT OF LITIGATION EXPENSES AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT THEREOF**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .................................................................................2

II.   FACTUAL BACKGROUND..................................................................................4

    A.    Broadwind's Business and the Intangible Asset Write-Down................................4

    B.    Substantive Allegations and the Court's Partial Dismissal Order .........................5

    C.    Discovery, Mediation and Settlement....................................................................7

III.  ARGUMENT .........................................................................................................9

    A.    Plaintiffs' Counsel Are Entitled to an Award of Attorneys' Fees and
          Expenses from the Common Fund.........................................................................9

          1.   Lead Counsel is Entitled to a Percentage Fee from the Common
               Fund ........................................................................................................10

          2.   The Court Should Award Attorneys' Fees Using the Percentage-of-
               the Fund Method ....................................................................................11

          3.   The Requested Fee is Reasonable and Appropriate as a Percentage
               of the Common Fund ..............................................................................13

               a.    The Contingent Nature of the Litigation Favors a Fee
                    Award of 33% of the Settlement Fund ..........................................13

               b.    The Settlement Here Was Not Likely at the Outset of the
                    Litigation and Lead Plaintiff Did Not Receive Assistance
                    From the SEC Inquiry.....................................................................17

                c.    The Requested Fee Is Consistent with Seventh Circuit
                    Authority and Empirical Data Regarding Fee Awards..................18

           4.   Plaintiffs' Counsel Provided the Class with Quality Legal Services
               that Produced Benefits to the Class ........................................................21

           5.   The Stakes of the Litigation Favor the Requested Fee .............................22

           6.   The Reaction of Class Members Supports the Reasonableness of
               the Requested Award ...............................................................................22

    B.    Plaintiffs' Counsel's Expenses are Reasonable and Were Necessarily
          Incurred to Achieve the Benefit Obtained ............................................................23

    C.    Lead Plaintiff and Class Representative Grothues Should be Reimbursed
          for His Reasonable Costs and Expenses ...............................................................24

i

IV.  CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Amalgamated Bank v. Coca-Cola Co.*, No. Civ. A. 1:05-CV-1226, 2006 WL 2818973
(N.D. Ga. Sept. 29, 2006) ............................................................. 14

*Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S.Ct. 1184 (Feb. 27, 2013).............. 10

*Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996)............................... 16

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990)..................................... 16

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ......................... 10

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975).......................................... 13

*Blum v. Stenson*, 465 U.S. 886 (1984) ...................................................... 11

*Carolina Cas. Ins. Co. v. Merge Healthcare Solutions, Inc.*, No. 11 C 3844, 2012 WL
123987 (N.D. Ill., Jan. 13, 2012) ..................................................... 11

*City of Omaha v. CBS Corp.*, No. 08 Civ. 10816 (PKC), 2010 WL 1029290
(S.D.N.Y. Mar. 16, 2010) ............................................................. 14

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998) ........................................... 24

*Cooper v. IBM Pers. Pension Plan,* No. 99-829-GPM, 2005 WL 1981501 (S.D. Ill.,
Aug. 16, 2005) .............................................................. 12, 17, 23

*Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117 (S.D.N.Y. 2010) ........................... 14

*First Interstate Bank of Nev.*, N.A. v. Nat'l Republic Bank of Chicago, et al., No. 80
C 6410, slip op. (N.D. Ill. Feb. 12, 1988) ........................................... 19

*Florin v. Nationsbank, N.A.*, 34 F.3d 560 (7th Cir. 1994) ......................... 10, 11, 12, 17

*Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill. 1998) ..................................... 20

*Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001) ..................................... 15

*Goldsmith v. Tech. Solutions Co.*, No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct.
10, 1995) ............................................................................ 20

*Great Neck Capital Appreciation Inv. P'ship, L.P., et al. v. PricewaterhouseCoopers,
L.L.P.*, 212 F.R.D. 400 (E.D. Wis. Nov. 6, 2002)................................... 12, 17

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc., et al.*, No. 04 C
1107, slip op. (N.D. Ill. July 24, 2006) ............................................. 18

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999) ........................................ 15

*Gulf Oil/Cities Serv.*, 142 F.R.D. at 597 ........................................................................ 17

*In re Abbot Laboratories Sec. Litig.*, No. 92–C–3869 MEA, 1995 WL 792083 (N.D.
 Ill., Jul. 3, 1995) ..................................................................................................... 11

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028
 (N.D. Ill. 2011) ............................................................................................ 12, 17, 24

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,  No. 07-61542-CIV-UNGARO, 2011
 WL 1585605 (S.D. Fla. April 25, 2011) ................................................................ 16

*In re Caremark Int'l Inc. Sec. Litig.*, No. 94 C 4751, slip op. (N.D. Ill. Dec. 15, 1997).............. 19

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ....................................... 12, 24

*In re Digi Int'l, Inc. Sec. Litig.*, No. 00-3162, 2001 WL 753869 (8th Cir. July 5, 2001).............. 15

*In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, slip op. (N.D. Ill.
 Apr. 21, 2000) ......................................................................................................... 19

*In re JDS Uniphase Corp. Sec. Litig*, No. C-02-1486 CW (EDL), 2007 WL 4788556
 (N.D. Cal. Nov. 27, 2007) ................................................................................. 16, 22

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp.
 2d 997 (E.D. Wis. 2010) ......................................................................................... 24

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) .............................. 23

*In re Nanophase Techs. Corp. Sec. Litig.*, No. 98 C 3450, slip op. (N.D. Ill. Mar. 27,
 2001) ........................................................................................................................ 18

*In re Nuveen Fund Litig.,* No. 94 C 360, slip op. (N.D. Ill. June 3, 1997) ................................... 19

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ...................................... 15

*In re Radion Sec. Litig.*, 612 F. Supp. 2d 594 (E.D. Pa. 2009)..................................... 14

*In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)................................. 15

*In re Soybean Futures Litig.*, No. 89 C 7009, slip op. (N.D. Ill. Nov. 27, 1996) ........................ 19

*In re Spyglass, Inc. Sec. Litig.*, No. 99 C. 0512, slip op. (N.D. Ill. May 23, 2000)..................... 18

*In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ........................ 11, 12, 13, 21, 23

*In re Synthroid Mktg. Litig.*, 325 F.3d 974, 975 (7th Cir. 2003) ............................. 11, 20

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 523 (E.D.N.Y. 2003), *aff'd, Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ............................................................................................................ 17

*J.I. Case Co. v. Borak*, 377 U.S. 426 (1964) ............................................................ 10

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986) ...................................................... 11

*Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 02-cv-5893 (N.D. Ill. May 7, 2009) ...................................................................................................... 22

*Levitin v. Paine Webber, Inc.*, 159 F.3d 698 (2d Cir. 1998) ...................................... 15

*Liebhard, et al. v. Square D Co., et al.*, No. 91 C 1103, slip op. (N.D. Ill. June 15, 1993) .................................................................................................................. 19

*Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999) ...................................... 15

*McKittrick v. Gardner*, 378 F.2d 872 (4th Cir. 1967) .............................................. 13

*Meyenberg v. Exxon Mobil Corp.*, No. 3:05-cv-15-DGW, 2006 WL 2191422 (S.D. Ill. July 31, 2006) .................................................................................................. 20

*Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445 (N.D. Ill. Nov. 1, 2011)................ 10

*Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999) ............................................ 15

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856 (ND Ill. Dec. 10, 2001) ........................................................................ 20, 24

*Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) .................................... 1, 16, 21, 22

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ...................... 19, 20, 21, 23

*Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997) .................................................. 15

*Spicer v. Chicago Bd. Options Exchange, Inc.*, 844 F. Supp. 1226 (N.D. Ill. 1993).................. 24

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) .................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................ 10

*Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) .................................... 18, 19, 21

*Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988).................................. 16

*Weiner, et al. v. The Quaker Oats Co., et al.*, No. 98 C 3123 (RP), slip op. (N.D. Ill. Sept. 14, 2001) .................................................................................................... 18

## STATUTES

15 U.S.C. §78u-4(a)(6) ............................................................................................ 10

15. U.S.C. §78u-4(a)(4) ........................................................................................... 24

## OTHER AUTHORITIES

*Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal
Stud. (2004)............................................................................................................ 23

*Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review* (July
2011) ............................................................................................................... 19, 21

*Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements,
is Stabilization Ahead?* (April 2006) ................................................................... 18

*Recent Trends IV: What Explains Filings and Settlements in Shareholder Class
Actions?* (Nov. 1996)............................................................................................ 19

Lead Plaintiff's[1] counsel, Federman & Sherwood ("Lead Counsel"), with the assistance of Liaison Counsel for Plaintiffs,[2] James T. Crotty & Associates ("Crotty"), and additional counsel for Plaintiffs, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), (collectively "Plaintiffs' Counsel"), have succeeded in obtaining a settlement consisting of $3.915 million in cash (the "Settlement Fund") for the benefit of the Class (the "Settlement") despite serious obstacles to recovery. Lead Counsel now respectfully moves this Court for an award of attorneys' fees to Plaintiffs' Counsel in the amount of 33% of the Settlement Fund, along with $134,905.79 in expenses that were reasonably and necessarily incurred in prosecuting and resolving this action (the "Action" or "Litigation").[3] In addition, Lead Plaintiff Grothues respectfully requests an award of $3,000 for his expenses incurred, and effort expended, in participating in this Litigation and achieving this resolution.

---

[1] This Court initially appointed Jerry Pehlke, Jr. ("Pehlke") as Lead Plaintiff and approved his selection of Lead and Liaison Counsel, James T. Crotty, by Order dated July 7, 2011. On November 26, 2012, the Court granted Pehlke's Motion to Withdraw as Lead Plaintiff. Dkt. No. 116. For purposes of this Settlement only, Plaintiff Brian M. Grothues ("Grothues") and Defendants Broadwind Energy, Inc. ("Broadwind" or the "Company") and J. Cameron Drecoll ("Drecoll"), the Company's former Chief Executive Officer (collectively the "Parties"), have agreed, subject to the approval of this Court, that Grothues should be appointed Lead Plaintiff. On March 14, 2013, the Court preliminarily approved the Settlement, certified the Settlement Class for the purposes of effectuating the Settlement, and appointed Grothues as Lead Plaintiff and class representative. Dkt. No. 133. All capitalized terms not defined herein have the same meaning set forth in the Stipulation of Settlement, dated as of March 6, 2013 (the "Stipulation"), filed with the Court on March 11, 2013. *See* Dkt. No. 130.

[2] Plaintiffs are defined in the Stipulation as Grothues and Pehlke. Robbins Geller Rudman & Dowd LLP's client, Arthur L. Brasher ("Brasher"), was involved in this litigation but withdrew for personal reasons. Nevertheless, Lead Counsel believed it was appropriate and in the best interest of the Class to continue working with Robbins Geller, which brought to this litigation a depth of expertise and additional resources on which the Class could draw upon in prosecuting and ultimately resolving these claims.

[3] The notice mailed to Members of the Class (the "Notice") informed them that Lead Counsel would seek an award of up to 33% of the Settlement Fund and expenses not to exceed $230,000.00, plus interest on both amounts, and that Lead Plaintiff would seek an award of $3,000.00 for his expenses incurred, and effort expended, in participating in this Litigation. The Notice also informed Class members that the approval of the Settlement is not subject to the approval of these awards, and that the issuance of these awards requires Court approval.

## I.  PRELIMINARY STATEMENT

This Settlement is the culmination of two years of litigation.  Through their efforts, Lead Plaintiff with the assistance of Liaison Counsel and additional Plaintiffs' Counsel have secured a $3.915 million cash Settlement for the Class in a difficult securities fraud case that challenged the timing of Broadwind's disclosure of an $82.2 million write-down of the intangible assets and goodwill of its largest subsidiary, Brad Foote Gear Works, Inc. ("Brad Foote").  This result represents a recovery of 17.6% of Lead Plaintiff's damages expert's conservative assessment of approximately $22.2 million in damages, and 10.9% of the damages expert's most liberal estimate of approximately $35.8 million in damages.  Without their efforts, this Litigation could have dragged on for several years, if not longer when considering likely appeals, and the Class might never have obtained the value of the Settlement, much less any recovery.

Moreover, as explained below and in the accompanying submissions,[4] this Settlement is the result of an informed understanding of the strengths and weaknesses of the case and hard-fought negotiations.  To reach this juncture, Plaintiffs' Counsel conducted interviews of former employees of Broadwind; successfully opposed a motion to dismiss as to the timing of Broadwind's decision to record the impairment charge; conducted extensive document discovery involving Defendants and 12 non-parties;[5] and reviewed and analyzed more than 234,000 pages

---

[4] In support of this application, Lead Plaintiff submits: the Declaration of William B. Federman in Support of: (A) Lead Plaintiff's Motion for Final Approval of Settlement; and (B) Lead Plaintiff's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses, and Reimbursement Award ("Federman Declaration"); and the Declaration of Wayne R. Andersen in Support of Final Approval of the Settlement and Plaintiffs' Counsel's Motion for Attorneys' Fees and Expenses (Andersen Declaration"), a retired judge of this Court who served as a mediator and facilitated the resolution of the Litigation.  Lead Plaintiff has also contemporaneously filed a Motion for Final Approval of the Proposed Class Action Settlement and Approval of Plan of Allocation and supporting memorandum.

[5] As indicated below, these non-parties included, among others: Broadwind's two largest customers during the relevant period, Clipper Windpower, LLC ("Clipper") and General Electric ("GE"); the

of documents. Plaintiffs' Counsel also conferred with their retained class certification and damages expert, and participated in two mediation sessions in Chicago with Judge Andersen, as well as numerous other communications with him and defense counsel over the course of several months.

As a result of their efforts and this Court's guidance on the motion to dismiss, Lead Plaintiff's Counsel recognized that this case hinged on proving that "Defendants delayed reporting the results of their annual October goodwill impairment tests in order to keep stock prices inflated through the January 2010 public offering." *Brasher v. Broadwind Energy, Inc.,* No. 11 CV 991, 2012 WL 1357699, at *22 (N.D. Ill. Apr. 19, 2012). Moreover, as the Court recognized in its decision: "It is of course possible that failure to detect a massive impending write-down was the result of negligence. Many factual issues must be resolved before that can be ruled out." *Id.* at *24. As explained below, Plaintiffs' Counsel learned in discovery and through mediation just how difficult it would be to establish that Drecoll and others intentionally delayed disclosing the impairment test results in view of the Company's diversion of significant resources and attention to launching Broadwind's secondary offering.

Accordingly, this Settlement is the product of careful and ongoing deliberation on the part of Lead Plaintiff and Lead Counsel to assess the likelihood of achieving a significant judgment at trial and, if necessary, protecting that judgment on appeal. Moreover, in achieving the Settlement, Plaintiffs' Counsel expended over 3,188.15 hours, and incurred more than $134,905.79 in expenses in prosecuting and resolving the Litigation, and Lead Plaintiff spent a substantial amount of time in assisting his counsel, responding to discovery and preparing and

Company's auditor, Grant Thornton LLP ("Grant Thornton"); and the Company's valuation consultants, Valuation Research Corp. and Crowe Horwath LLP.

sitting for his deposition. Accordingly, as compensation for their efforts, Plaintiffs' Counsel respectfully request the Court to award 33% of the $3.915 million Settlement Fund, plus $134,905.79 in expenses (which requests Lead Plaintiff has approved).[6] The 33% fee ward, if granted, will result in a negative multiplier of 0.79. In addition, Lead Plaintiff requests reimbursement of $3,000 for his expenses incurred in assisting counsel. For the reasons set forth below, the requested awards are fair and reasonable and should be granted by the Court.

## II.    FACTUAL BACKGROUND[7]

### A.    Broadwind's Business and the Intangible Asset Write-Down

As alleged in the Complaint, Broadwind described itself as a provider of "technologically advanced high-value products and services to the U.S. wind energy industry." ¶42. The Company's product and service portfolio provided its customers, "including wind turbine manufacturers, wind farm developers and wind farm operators, with access to a broad array of wind component and service offerings." *Id.* Broadwind acquired Brad Foote, a gearing manufacturer that became a central subsidiary, on October 19, 2007. ¶47. In connection with its acquisition of Brad Foote, Broadwind recognized intangible assets (customer relationships) in the amount of $75.5 million and goodwill in the amount of $21 million. ¶4.

On January 15, 2010, Broadwind's secondary public offering took place, pursuant to which it sold 15 million shares of common stock to the public at $5.75 per share, raising more

---

[6] The Amount requested includes all compensation for attorneys involved in the Litigation.

[7] In addition to the factual background set forth herein, the Court is respectfully referred to the Federman Declaration and the Andersen Declaration for further information concerning the Litigation and the background of the Settlement. The Court is also respectfully referred to the Amended Class Action Complaint for Violation of the Federal Securities Laws, dated September 13, 2011 (the "Complaint," cited herein as "¶__").

than $86 million in proceeds. ¶¶6, 175. In connection with the offering, Drecoll sold 1,125,000 of his personally held shares for net proceeds of over $6 million. ¶176.

On March 12, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2009 (the period ended December 31, 2009), and filed its 2009 annual report on Form 10-K. ¶¶184, 189. On that date, the Company disclosed that it had recorded an $82.2 million impairment charge to goodwill and intangible assets for the fourth quarter of 2009, primarily as a result of a reduction in the fair value of the Company's customer relationships. ¶¶190, 196.

### B. Substantive Allegations and the Court's Partial Dismissal Order

On February 11, 2011, Brasher filed a securities class action in this Court on behalf of purchasers of Broadwind common stock alleging, among other things, that the Company delayed recognizing its intangible asset charge because of the loss of a key customer. Subsequently, Pehlke and others moved for appointment as Lead Plaintiff and, on July 7, 2011, the Court appointed Pehlke as Lead Plaintiff and approved his selection of counsel, Federman & Sherwood and Crotty, as Lead and Liaison Counsel, respectively.

On September 13, 2011, after Plaintiffs' Counsel conducted an in-depth investigation and interviewed former employees of Broadwind, Pehlke, Grothues and Brasher filed the Complaint, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of a class of purchasers or acquirers of Broadwind common stock during the period from March 16, 2009 through August 9, 2010, inclusive. The Complaint asserted claims against Broadwind, Drecoll, other executives of the Company, and members of an investing group that owned a stake in Broadwind (identified below, together with others, as the "Dismissed Defendants").

Specifically, the Complaint alleged that, from November 2008 to July 2009, GE and Clipper, Broadwind's two largest customers, had cut their order forecasts by 75% and continued

to exhibit declining demand in subsequent months. Allegedly, the Company's contracts with GE and Clipper had become so attenuated that GE was forced to renegotiate its purchase contract with Broadwind while Clipper simply stopped paying Broadwind entirely. Accordingly, the Complaint alleged, Broadwind was required to write down the valuation of its goodwill and intangible assets, which was derived in large part from the value of its customer relationships with GE and Clipper.

The Complaint alleged that Defendants failed to disclose the adverse news of GE and Clipper's lowered order forecasts or to account for the impairment of Broadwind's goodwill and intangible assets. ¶6. Rather, the Complaint alleged, Defendants disregarded "triggering" events and circumstances that required interim impairment analyses of the Company's intangible assets and goodwill, including the significant decline in customer demand and historical and present operating losses of the Brad Foote operating segment. ¶¶225, 232, 229-30. The Complaint further alleged that Defendants delayed performing the Company's annual impairment review, scheduled to occur in October 2009, and delayed reporting the $82.2 million impairment charge (¶¶6, 249), to allow the January 15, 2010 secondary offering to occur, in which the Company and Drecoll received millions of dollars in proceeds. As alleged, the subsequent disclosure of the charge in March 2010 resulted in a decline in Broadwind's stock price and damaged investors.

On November 18, 2011, Defendants moved to dismiss the Complaint, which the Court granted in part and denied in part on April 19, 2012. *See Broadwind*, 2012 WL 1357699 at *12. In its Order, the Court shortened the proposed class period "to run from March 16, 2009, the date Broadwind filed its Form 10–K for the year ending December 31, 2008, to March 19, 2010, one week after Broadwind filed its 2009 Form 10–K announcing the $82.2 million charge to goodwill and other intangible assets." *Id.* The Court further held that "Plaintiffs' claim that

6

Broadwind and Defendant Drecoll engaged in deceptive practices with regards to the timing of the impairment write-down survives." *Id.* at *25. All other claims were dismissed with prejudice, including claims against the Dismissed Defendants.[8] *Id.* at **11-12, *25.

### C. Discovery, Mediation and Settlement

Following the Court's ruling on the motion to dismiss, the Parties engaged in document discovery. In response to Plaintiffs' discovery requests, Defendants produced over 19,000 pages of documents. Additionally, Plaintiffs served 13 subpoenas for the production of documents on the following third parties: (1) Grant Thornton (two separate subpoenas); (2) Valuation Research Corp.; (3) Crowe Horwath LLP; (3) Clipper; (4) GE; (5) Macquarie Capital; and (6) various Tontine entities.[9] In connection with their discovery efforts, Plaintiffs' Counsel reviewed over 234,430 pages of highly technical and complex accounting and other documents relating to the timing of Broadwind's impairment write-downs and matters concerning the declining forecasts by the Company's two largest customers, Clipper and GE.

As discovery continued, Plaintiffs moved forward with an application to certify the class. At the same time, the Parties engaged in settlement discussions with the assistance of JAMS mediator Judge Andersen, attending mediation sessions in Chicago, Illinois on August 20, 2012 and January 18, 2013.[10] Additionally, the Parties engaged in numerous telephone conversations

---

[8] The Dismissed Defendants are Stephanie K. Kushner, Matthew J. Gadow, Stephen E. Graham, Kevin E. Johnson, James M. Lindstrom, David P. Reiland, Charles H. Beynon, William T. Fejes, Terence P. Fox, Tontine Capital Partners, L.P., Tontine Capital Overseas Master Fund, L.P., Tontine Partners, L.P., Tontine Overseas Fund, Ltd., Tontine 25 Overseas Master Fund, L.P., and Jeffrey Gendell.

[9] The Tontine entities include Tontine Associates LLC, Tontine Capital Management LLC, Tontine Management LLC, Tontine Overseas Associates LLC, Tontine Power Partners, LP, and Tontine Asset Associates.

[10] Representatives of certain of Defendants' Directors' and Officers' Liability Insurers also attended these mediation sessions. In addition, prior to the first mediation session on August 20, 2012, the Parties

with the mediator in between sessions. A few days after the final mediation session, Judge Andersen made a "mediator's proposal" and, on January 23, 2013, the Parties accepted the proposal to settle the Litigation, as embodied in the Stipulation.

In determining to accept the mediator's proposal, Lead Plaintiff and Lead Counsel considered, among other things, the difficulty of establishing that "Defendants delayed reporting the results of their annual October goodwill impairment tests in order to keep stock prices inflated through the January 2010 public offering" – a crucial issue that the Court identified in partially denying dismissal. *Broadwind*, 2012 WL 1357699, at *22. They also considered the possibility, based on evidence developed in discovery and the mediation discussions, that the "failure to detect [the] massive impending write-down was the result of negligence." *Id*. at *24. In fact, the documents obtained in discovery did not uniformly support Lead Plaintiff's theory of liability, and a challenge to establishing liability remained that impairment testing at Broadwind began in the fourth quarter of 2009 and continued through part of the first quarter of 2010, with no impairment concerns noted by Broadwind's outside auditor or valuation firm. Further, it appears that Broadwind first received a draft of the valuation firm's report suggesting that an impairment write-down was needed on February 10, 2010, a few weeks after the offering. These and other facts undercut a finding of scienter and, as discussed further below, guided the decision to settle this matter.

---

exchanged and submitted to Judge Andersen written mediation statements, along with evidence that each of the Parties submitted in support of their respective submissions.

### III.    ARGUMENT

####    A.    Plaintiffs' Counsel Are Entitled to an Award of Attorneys' Fees and Expenses from the Common Fund

On behalf of Lead Plaintiff and the Class, Plaintiffs' Counsel have recovered a $3.915 million cash Settlement.  The Settlement represents a recovery of 10.9% of the Class's maximum potential damages at trial based on Lead Plaintiff's damages expert's most liberal estimate of approximately $35.8 million in damages.  Moreover, based on the conservative estimate by Lead Plaintiff's expert of approximately $22.2 million in damages, the Settlement represents a 17.6% recovery for the Class.  Notably, Broadwind did not restate its SEC filings to correct material accounting errors, and there was no admission of wrongdoing by Defendants.

Plaintiffs' Counsel's fee request is reasonable for the following reasons: (1) the Litigation was prosecuted entirely on a contingent basis and Plaintiffs' Counsel's investment in time and money was substantial and always at risk of non-payment; (2) the $3.915 million Settlement Fund obtained by Plaintiffs' Counsel was not likely from the outset of the Litigation and represents a favorable result in terms of both dollar amount and the percentage of damages recovered; (3) the percentage fee requested here is in the range of comparable percentages recently awarded in other cases with comparable recoveries; (4) the Class and Defendants were represented by counsel of the highest caliber who performed high quality work; and (5) Plaintiffs' Counsel's stakes in the Litigation will continue to increase the longer the Litigation remains unresolved (*i.e.*, Plaintiffs' Counsel will continue to spend time and effort in a case which may result in little or no recovery for the Class and compensation for Plaintiffs' Counsel).

In addition, Plaintiffs' Counsel's litigation expenses should be awarded in full as they were reasonably and necessarily incurred in the prosecution of this Litigation and Lead Plaintiff

should be reimbursed for his reasonable expenses and effort incurred in his involvement in and oversight of the Litigation.

### 1. Lead Counsel is Entitled to a Percentage Fee from the Common Fund

"When a case results in the creation of a common fund for the benefit of the plaintiffs class, the common fund doctrine allows plaintiffs' attorneys to petition the court to recover its fees out of the fund" on a percentage basis. *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 563 (7th Cir. 1994); *see also Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *2 (N.D. Ill. Nov. 1, 2011). The common fund doctrine prevents unjust enrichment and encourages counsel to protect the rights of those who have very small claims. To those ends, the Supreme Court has observed that private securities fraud actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [Securities and Exchange] Commission action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, at 313 (2007) ("[M]eritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission . . . ."); *Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1201-02 (Feb. 27, 2013).

The text of the PSLRA also supports awarding attorneys' fees in securities cases using the percentage method, as it provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage amount" recovered for the class. 15 U.S.C. §78u-4(a)(6). Moreover, "the Supreme Court has suggested . . . that the percentage approach is typically used in common fund cases." *Carolina Cas. Ins.*

*Co. v. Merge Healthcare Solutions, Inc.*, No. 11 C 3844, 2012 WL 123987, at *5 (N.D. Ill., Jan. 13, 2012) (citing *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) (noting that "under 'the common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class").

### 2. The Court Should Award Attorneys' Fees Using the Percentage-of-the Fund Method

While the Seventh Circuit has noted that "the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court," it has recognized the advantages of applying the percentage-of-the-fund method, including its relative objectivity and ease of administration. *See Florin*, 34 F.3d at 566. "The percentage of recovery method is the simplest of the methods since it requires merely discerning the appropriate percentages from similar cases." *In re Abbot Laboratories Sec. Litig.*, No. 92–C–3869 MEA, 1995 WL 792083, at *4 (N.D. Ill., Jul. 3, 1995). The percentage-of-the-fund method is also consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *See, e.g.*, *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the market rate.'") (emphasis in original).

In determining the appropriate fee percentage in common fund cases, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"); *see also In re Synthroid Mktg. Litig.*, 325 F.3d 974, 975 (7th Cir. 2003) ("*Synthroid II*") ("A court must give counsel the market rate for legal services."). The Seventh Circuit has made it clear that the "market rate" is "as we have been at pains to stress, [what] the lawyer . . . would have gotten in the way of a fee in an arms' length

11

negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).

In a court's role of acting as a fiduciary of the class to determine the reasonableness of the fee requested in light of the market rate, *see Cont'l Ill.*, 962 F.2d at 572, it must consider "the risk of nonpayment a firm agrees to bear . . . the quality of [the firm's] performance . . . the amount of work necessary to resolve the litigation, and . . . the stakes of the case." *Synthroid I*, 264 F.3d at 721. Also relevant to this inquiry is an assessment of "the riskiness of the litigation by measuring the probability of success of this type of case at the outset of the litigation." *Florin*, 34 F.3d 565 (emphasis omitted); *see also Cooper v. IBM Pers. Pension Plan,* No. 99-829-GPM, 2005 WL 1981501, at *8 (S.D. Ill., Aug. 16, 2005) (holding that "[t]he Fee Request is unreasonable only if the result was likely from the outset"), *rev'd in part on other grounds*, 457 F.3d 636 (7th Cir. 2006). As shown herein, each of these factors favors the fee request. In any event, the requested fee of 33%, plus interest, approximately $1.29 million, is unquestionably fair and reasonable in light of Plaintiffs' Counsel's lodestar of more than $1,641,995.

Further, in determining the reasonableness of attorneys' fees applications, courts within the Seventh Circuit also consider the unique circumstances of the case. *See, e.g.*, *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 (N.D. Ill. 2011) ("[t]his case requires the Court to determine reasonable attorneys' fees in decidedly unique circumstances"); *see also id.* at 1035-40 (applying the circumstance of the case in making a reasonableness finding); *Great Neck Capital Appreciation Inv. P'ship, L.P., et al. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 411 (E.D. Wis. Nov. 6, 2002) (noting courts "increasingly use the percentage of fund approach after consideration of the specified guidelines

12

under the particular circumstances involved"). As shown herein, the unique circumstances of this case also militate in favor of the Court granting the fee request.

### 3. The Requested Fee is Reasonable and Appropriate as a Percentage of the Common Fund

#### a. The Contingent Nature of the Litigation Favors a Fee Award of 33% of the Settlement Fund

As noted by the Seventh Circuit in *Synthroid I*, "[t]he market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear." 264 F.3d at 721. Here, Plaintiffs' Counsel assumed significant risk that Defendants would successfully defend this case in further proceedings and that the Class (and, consequently, Plaintiffs' Counsel) would recover nothing.[11]

In this case, Plaintiffs' Counsel devoted substantial resources to the factual investigation and development of the Class's claims and only engaged in mediation after analyzing internal documents concerning the timing and circumstances of the write-down. In addition, although the SEC had issued a subpoena to Broadwind "in connection with an informal inquiry that we received in November 2010 arising out of a whistleblower complaint received by the SEC related to revenue recognition, cost accounting and intangible and fixed asset valuations at Brad Foote," the SEC did not engage in any formal action with respect to such matters (and, in fact, still has not). *See* Broadwind Form 10-K for the year ended December 31, 2012, filed with the SEC on February 28, 2013, at 20-21. Thus, unlike in other cases, Lead Plaintiff's efforts were not assisted in any meaningful way by governmental or regulatory agencies investigating the subject

---

[11] *See Blackie v. Barrack*, 524 F.2d 891, 899 n.15 (9th Cir. 1975) ("For what it is worth, however, the empirical evidence indicates that a relatively high proportion of class actions are not settled, but disposed of in defendant's favor on preliminary motions."); *McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967) ("The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services."").

matter of the claims. Accordingly, Lead Plaintiff and Plaintiffs' Counsel expended significant effort to develop this case, and were at risk of failing to secure any recovery if their efforts were unsuccessful at any stage.

Furthermore, the subject matter of this lawsuit presented complex legal issues that would have been difficult to overcome in further proceedings or at trial, heightening the risk associated with prosecuting this case. As noted above, the only claim upheld by the Court was that directed to the timing of the secondary offering, which required Lead Plaintiff to establish that Broadwind had delayed issuing the results of its annual impairment testing to allow the offering to proceed without disclosure of the adverse news regarding the write-down. *See Broadwind*, 2012 WL 1357699, at *25. As numerous courts have explained, it is particularly difficult to prevail on a securities fraud claim based on the timing of impairment to goodwill or intangible assets because the process of determining whether impairments exist is inherently subjective in nature. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 122-23 (S.D.N.Y. 2010); *City of Omaha v. CBS Corp.*, No. 08 Civ. 10816(PKC), 2010 WL 1029290, at *10 (S.D.N.Y. Mar. 16, 2010); *In re Radion Sec. Litig.*, 612 F. Supp. 2d 594, 606 (E.D. Pa. 2009); *Amalgamated Bank v. Coca-Cola Co.*, No. Civ. A. 1:05-CV-1226, 2006 WL 2818973, at *14 n.10 (N.D. Ga. Sept. 29, 2006).

Thus, even after the Court allowed this single claim to survive, Plaintiffs' Counsel faced the substantial tasks of defeating summary judgment and proving to a jury that Defendants had consciously or recklessly committed securities fraud by making misleading statements and/or omissions regarding the value of Broadwind's intangible assets and goodwill and related matters in advance of the offering, and, further, that this conduct was a proximate cause of Broadwind's stock price decline after the offering. Of course, Defendants remained resolute in arguing that they did nothing wrong and, in the mediation, offered evidence to support their position. Yet,

14

even if liability were easily established, the Class would have faced significant risks in proving both loss causation and damages. Indeed, the parties sharply disagreed as to the amount of damages and loss causation with respect to those damages, with Defendants' citing studies by consulting firms and academics finding minimal stock price declines were typical in reaction to impairment announcements. Thus, Defendants strongly asserted that the majority of the Class's claimed damages were caused by other factors, including Broadwind's contemporaneous announcement of disappointing earnings, even absent the impairment charge, and a pessimistic outlook for the remainder of the year. Moreover, at the time of the mediation and settlement, Plaintiffs' motion for class certification was pending -- although Plaintiffs' financial expert opined that Broadwind common stock traded in an efficient market throughout the Class Period -- the parties disagreed as to whether the market for Broadwind stock was efficient, particularly in the earlier parts of the Class Period. Despite these risks, Plaintiffs' Counsel committed significant resources to prosecuting this Action.

Further, Plaintiffs' Counsel are aware of numerous hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of a case, or a decision following a trial on the merits, the result was adverse to the plaintiffs and counsel never received compensation for its work. Indeed, there are numerous appellate decisions affirming summary judgment and directed verdicts for defendants in securities class actions.[12] Lawyers who specialize in contingent matters operate in a legal

_____

[12] *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Digi Int'l, Inc. Sec. Litig.*, No. 00-3162,2001 WL 753869 (8th Cir. July 5, 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *Levitin v. Paine Webber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). Moreover, even plaintiffs who proceed to trial may not prevail or

environment fraught with uncertainty and the fact of the matter is, winning cases must, in large part, pay for meritorious, but otherwise unsuccessful efforts. Clearly, the risks associated with this contingent litigation were many and in determining whether the requested fee is consistent with Seventh Circuit precedent, the Court should take this dynamic into account. *See, e.g.*, *Sutton v. Bernard*, 504 F.3d 688, 694 (7th Cir. 2007) ("Because the district court failed to provide for the risk of loss, the possibility exists that Counsel, whose only source of a fee was a contingent one, was undercompensated.").

In support of Plaintiffs' Counsel's fee request, Judge Andersen, the mediator in the Litigation and a former federal judge with nearly 20 years on the bench of this Court (and 7 years as a state court judge before that), has submitted the Andersen Declaration in support of approval of the Settlement and Plaintiffs' Counsel's application for attorneys fees. The Andersen Declaration discusses the strengths and weaknesses of Lead Plaintiff's case, the steps leading up to the ultimate resolution, and the amount of time and effort expended by Plaintiffs' Counsel in the Litigation.

In sum, the only certainties regarding this case were that each element of the Class's claims would have been vigorously disputed by Defendants at trial and on appeal, and that the risk of recovering nothing was all too real. The litigation risk here is a circumstance that justifies

---

find a favorable verdict overturned on appeal. *See In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-61542-CIV-UNGARO, 2011 WL 1585605 (S.D. Fla. April 25, 2011) (granting defendants' motion for judgment as a matter of law after jury rendered verdict in favor of plaintiffs); *In re JDS Uniphase Corp. Sec. Litig*, No. C-02-1486 CW (EDL), 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (jury verdict in favor of all defendants); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning verdict in favor of plaintiffs after a decade of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' verdict for securities fraud); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (same).

the requested fee. *AT&T Mobility*, 792 F. Supp. 2d at 1032; *Great Neck Capital*, 212 F.R.D. at 411.

> **b.** **The Settlement Here Was Not Likely at the Outset of the Litigation and Lead Plaintiff Did Not Receive Assistance From the SEC Inquiry**

In considering the reasonableness of the requested fee, the Court should also assess the probability that the result obtained was likely from the outset of the litigation. *Florin*, 34 F.3d at 565; *Cooper*, 2005 WL 1981501, at *7. Here, as explained above, the Settlement achieved in this case was not likely from the outset of the Litigation, which further militates in favor of the fee request under the circumstances.

Further, courts generally recognize that an enhanced fee award is justified where, as here, the class does not "free ride" on the efforts of a governmental enforcement proceeding, but rather sets out to prove the violation on its own. *See, e.g.*, *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 523 (E.D.N.Y. 2003) (holding that attorneys are deserving of "higher compensation, particularly where, as here, Lead Counsel did not benefit from any previous or simultaneous government litigation"), *aff'd*, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005). As Judge Mukasey stated in *Gulf Oil/Cities Serv.*, 142 F.R.D. at 597, "[t]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own."

17

As noted above, to this day, there is no indication that the SEC has taken or will take any enforcement action[13] against the Company, which is arguably probative of the SEC's internal realization that it would be difficult to successfully pursue claims against Broadwind.   In addition, Lead Plaintiff made a Freedom of Information Act request on the SEC in an effort to obtain documents related to the SEC's inquiry, but the request was denied.   The lack of an enforcement action, and the inability to obtain information from the SEC related to its inquiry, makes the Settlement all the more notable.   *See* Ronald I. Miller, Ph.D., Todd Foster, Elaine Buckberg, Ph.D., *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?* at 8 ("NERA April 2006") ("When allegations of a suit are subject to official investigation, for example by the SEC . . . [such] outside evidence of the merits of a case leads to an approximately 25% increase in expected settlement value.").   Here, an important factor favoring the requested fee is that Lead Plaintiff and his counsel uncovered and prosecuted the alleged fraud wholly on their own – and did not "free ride" on the efforts of the government (or anyone else).

> c.    **The Requested Fee Is Consistent with Seventh Circuit Authority and Empirical Data Regarding Fee Awards**

Plaintiffs' Counsel's request for attorneys' fees of 33% is within the range of awards made in this District and Circuit, as well as by courts throughout the country.[14]   Additionally, the

---

[13]Although inquiry began in November 2010, after nearly two and a half years the SEC has not taken any action against Broadwind.   Lead Counsel has been advised by the SEC that the average time for completion of an SEC investigation is 12 to 16 months.

[14] *See Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (30% of settlement fund); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc., et al.*, No. 04 C 1107, slip op. (N.D. Ill. July 24, 2006) (30% of settlement fund); *Weiner, et al. v. The Quaker Oats Co., et al.*, No. 98 C 3123 (RP), slip op. (N.D. Ill. Sept. 14, 2001) (33%); *In re Nanophase Techs. Corp. Sec. Litig.*, No. 98 C 3450, slip op. (N.D. Ill. Mar. 27, 2001) (33%); *In re Spyglass, Inc. Sec. Litig.*, No. 99 C. 0512, slip op. (N.D. Ill. May 23, 2000) (33%); *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, slip op. (N.D. Ill. Apr.

requested fee is in line with average fee awards in a series of class action studies conducted by National Economic Research Associates ("NERA") experts Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, as reflected in the publication entitled *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 ("Regardless of case size, fees average approximately 32 percent of the settlement."). In this report, NERA examined 433 settlements, 18 of which were in the Seventh Circuit where attorneys' fees as a percentage of settlements averaged 31.8%. *Id.* Here, the fee requested is in line with that average. It is also consistent with a recent NERA survey of securities class action settlements from 1996 through 2012, which found that the median fee in settlements under $4 million was 33.3%. *See* Dr. Renzo Comolli, Sukaina Klein, Dr. Ronald I. Miller, and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review*, at 34, Figure 31 (2012) ("NERA Full-Year 2012") (Ex. 3 to Federman Declaration).

In addition, the requested fee is reasonable when viewed in the context of analogous fee awards in class actions that settled for less than $15 million. *See, e.g.*, *Taubenfeld*, 415 F.3d at 598-600 (finding that a court acted within its discretion in awarding 30% of a $7.25 million settlement fund, and holding that "attorneys' fees from analogous class actions settlements are indicative of a rational relationship between the record in this similar case and the fees awarded by the district court"); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597-99 (N.D. Ill. 2011) (awarding 33.3% of the $9.5 million settlement fund); *Retsky Family Ltd. P'ship v. Price*

---

21, 2000) (33%); *In re Caremark Int'l Inc. Sec. Litig.*, No. 94 C 4751, slip op. (N.D. Ill. Dec. 15, 1997) (33%); *In re Nuveen Fund Litig., No. 94 C 360*, slip op. (N.D. Ill. June 3, 1997) (33%); *In re Soybean Futures Litig.*, No. 89 C 7009, slip op. (N.D. Ill. Nov. 27, 1996) (33%); *Liebhard, et al. v. Square D Co., et al.*, No. 91 C 1103, slip op. (N.D. Ill. June 15, 1993) (33%); *First Interstate Bank of Nev.*, N.A. v. Nat'l Republic Bank of Chicago, et al., No. 80 C 6410, slip op. (N.D. Ill. Feb. 12, 1988) (39%).

*Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *4 (ND Ill. Dec. 10, 2001) (awarding a

33.3% fee from the $14 million settlement fund); *Synthroid II*, 325 F.3d at 980 ("We . . . give

consumer class counsel 30% for the first $10 million . . . ."); *Meyenberg v. Exxon Mobil Corp.*,

No. 3:05-cv-15-DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("[T]he Court is

independently aware that 33 1/3% to 40% (plus the cost of litigation) is the standard contingent

fee percentage in this legal marketplace for comparable commercial litigation."); *Gaskill v.

Gordon*, 942 F. Supp. 382, 388 (N.D. Ill. 1998) ("[T]he Court concludes that the professional

should recover 38% of the total fund available for distribution.  This award reflects an increase

of five percent over the court's original award of 33 1/3% . . . ."): *Goldsmith v. Tech. Solutions

Co.*, No. 92 C 4374, 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) ("Thirty-three percent

appears to be in line with what attorneys are able to command on the open market in arms-length

negotiations with their clients.").

For example, in *Schulte v. Fifth Third Bank*, class counsel secured a settlement of $9.5

million for the class and sought an award of attorneys' fees of $3,166,666, or 33 1/3% of the

settlement fund.  805 F. Supp. 2d at 597.  In considering various factors, Judge Dow held that an

award of attorneys' fees in the amount requested was reasonable.[15]  *Id.*  As discussed herein,

these same factors favor the requested fee award in this case.

---

[15] Specifically, Judge Dow considered that: (1) class counsel "had incurred a significant risk of
nonpayment by accepting [the] case"; (2) the quality of class counsel's performance in the litigation
favored approval of the fees requested; (3) the amount of work necessary to resolve the lawsuit was
substantial; and (4) the stakes in the case were high given the size of the class the complexity and costs of
the legal proceedings.  *Schulte*, 805 F. Supp. 2d at 597-98.

### 4. Plaintiffs' Counsel Provided the Class with Quality Legal Services that Produced Benefits to the Class

In evaluating a fee request, the Seventh Circuit has held that the trial court may consider the "quality of legal services rendered" by plaintiffs' counsel. *Taubenfeld*, 415 F.3d. at 600; *Synthroid I*, 264 F.3d at 721. Lead Counsel Federman & Sherwood has served as counsel in numerous securities class actions; Liaison Counsel Crotty has substantial experience in complex litigation; and Robbins Geller is a recognized leader in complex securities litigation. In this case, the skills of Plaintiffs' Counsel were called upon to obtain a favorable result for the Class. In fact, during two mediation sessions and multiple phone calls, Lead Plaintiff and Plaintiffs' Counsel demonstrated their willingness to continue to litigate the merits of this action all the way to trial, rather than accept a settlement that was not in the best interest of the Class. As a result, Plaintiffs' Counsel was able to negotiate a favorable result, representing approximately 10.9% of the most liberal measure of damages and 17.6% of the conservative estimate of damages. This recovery is reasonable especially in light of empirical evidence suggesting that, on average, cases with investor losses ranging from $20 million to $49 million, as in this case, typically settle for 9.1% of investor losses. *See* NERA Full-Year 2012*, at 32, Figure 29.

The quality of opposing counsel is also an important factor in evaluating the quality of Plaintiffs' Counsel's work. *Schulte*, 805 F. Supp. 2d at 598 ("[T]he quality of Class Counsel's performance in this litigation favors approval of the fees requested."). Plaintiffs' Counsel was opposed in this case by Sidley Austin LLP, which spared no effort in defending this case. In the face of this opposition, Plaintiffs' Counsel developed the Litigation so as to persuade Defendants to settle the case on terms favorable to the Class. This factor also favors the requested fee.

21

###### 5.    The Stakes of the Litigation Favor the Requested Fee

As the Litigation advanced through discovery, the stakes of this Action rose.  Indeed, even if Lead Plaintiff prevailed on summary judgment or at trial (an uphill battle in and of itself), Defendants would have had the opportunity to appeal any judgment and derail the resolution of this Action or delay it for years.  Indeed, many securities fraud cases have been lost at trial, on post-trial motion or appeal, and the delays that are typically associated with contentious litigation may interminably defer class members' receipt of compensation.[16]  *Restky*, 2001 WL 1568856, at \*2; *see also In re JDS Uniphase Corp. Sec. Litig.* , No. C-02-1486 CW (EDL), 2007 WL 478856 (N.D. Cal. Nov. 2007) (after a lengthy trial, the jury returned a verdict against plaintiffs and the action was dismissed).  Moreover, the legal and factual issues argued by both sides in this case only confirms its complexity and high-cost nature, which, at bottom, involved alleged accounting improprieties.  The stakes of this case thus also favor the requested fee.

###### 6.    The Reaction of Class Members Supports the Reasonableness of the Requested Award

In connection with presenting the Settlement to the Court for approval, 21,824 potential Class Members and nominees received the Notice, which informed them about the Settlement, that Plaintiffs' Counsel would apply for attorneys' fees of up to 33% of the Settlement Fund plus expenses not to exceed $230,000.00, and that they had the right to object to the Settlement and/or

---

[16] Robbins Geller's experience in *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 02-cv-5893 (N.D. Ill.), is illustrative of the risks and delays inherent in litigation such as this, even after a jury verdict in favor of plaintiffs and the class.  On May 7, 2009, following a six-week trial, the jury in *Household* returned a verdict finding that the defendants had violated the federal securities laws and that members of the class suffered damages of up to $23.00 per share.  *See Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 02-cv-5893 (N.D. Ill. May 7, 2009), Dkt. No. 1611.  The jury also found no liability for the first 19 months of the class period.  *Id.*  Subsequently, there were numerous post-verdict motions and extensive motion practice and discovery related to class members' claims.  As a result, nearly three years after a favorable verdict, judgment had yet to be entered, no class member had recovered damages, and counsel had not been awarded fees or expenses.

Plaintiffs' Counsel's fee and expense request. No Class Member has objected to the application for attorneys' fees and expenses. The lack of objections "is strong circumstantial evidence in favor of the settlement[.]" *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of the class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlement"); *see also Schulte*, 805 F. Supp. 2d at 586 (holding that "[a] very small percentage of affected parties ha[d] opposed the settlement" where the claims administrator had received over 100,000 claims, only 342 class members had excluded themselves from the settlement, and only 15 class members submitted documents that could be considered objections); *Cooper*, 2005 WL 1981501, at *7.

### B.    Plaintiffs' Counsel's Expenses are Reasonable and Were Necessarily Incurred to Achieve the Benefit Obtained

Plaintiffs' Counsel also request an award of expenses in the amount of $134,905.79, and have submitted declarations attesting to this amount. *See Synthroid I*, 264 F.3d at 722 (should counsel submit sufficiently detailed expense reports and records, "a federal court should not require more" for purposes of determining the reasonableness of the request for reimbursement). A significant portion of these expenses was for experts hired in connection with assisting with the class certification motion and evaluating damages, as well as for mediation services and, where necessary, travel and document management and reproduction costs.

An empirical study of the cost and expense of class actions finds that 4% of the relief obtained for a class is the median request for expenses. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud., 27, 70 (2004) (the "Eisenberg & Miller Study"); *see also* NERA Full-Year 2012 at 34 (finding median expense requests from 1996 to 2012 as representing 5.4% of settlements).

Courts have supported the use of the Eisenberg & Miller Study as an indicator of what the market would pay class counsel. *See, e.g.*, *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1015 (E.D. Wis. 2010) ("[T]he best indicator of what the market would pay class counsel for their services is data contained in a recently updated [Eisenberg & Miller Study]."). Here, the expense request represents approximately 3.4% of the $3.915 million Settlement Fund and, thus, is in line with the average request.

### C. Lead Plaintiff and Class Representative Grothues Should be Reimbursed for His Reasonable Costs and Expenses

Pursuant to the PSLRA, the Court has discretion to reimburse "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15. U.S.C. §78u-4(a)(4). Lead Plaintiff Grothues requests an award of $3,000.00 to reimburse him for the time and effort he expended as part of his active involvement in this case. In *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (citing *Spicer v. Chicago Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267 (N.D. Ill. 1993)), the Seventh Circuit held that a court may grant a special award to the named plaintiff in a class action based on "the actions the plaintiff had taken to protect the interests of the class, the degree to which the class benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."

As set forth in the Grothues Declaration, Lead Plaintiff devoted substantial time to the oversight of, and participation in, the Litigation, including responding to Defendants' discovery requests and sitting for a deposition. *See* Grothues Decl., ¶¶5-9, Ex. 6 to Federman Declaration. The amount requested will reimburse Lead Plaintiff for the time and effort he expended in his representation of the Class. Such reimbursement is appropriate under in this case. *See AT&T Mobility*, 792 F. Supp. 2d at 1041 (citing *Cont'l Ill.*, 962 F.2d at 571); *see also Retsky*, 2001 WL

1568856, at *4 (finding that a special award of $7,500 for named plaintiff was reasonable as reimbursement for plaintiff's time and effort expended in pursuing the litigation).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Counsel respectfully request that the Court award attorneys' fees of 33% of the Settlement Fund plus expenses in the amount of $134,905.79, with interest on both amounts, and Lead Plaintiff respectfully requests that the Court approve his request for the reimbursement of expenses in the amount of $3,000.

Dated: May 28, 2013                                  Respectfully submitted,


/s/ William B. Federman
William B. Federman
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone:  (405) 235-1560

*Lead Counsel for Plaintiffs*

James T. Crotty
JAMES T. CROTTY & ASSOCIATES
208 S. LaSalle St., Suite 1750
Chicago, IL 60604
Telephone:  (312) 623-1599

*Liaison Counsel for Plaintiffs*

Samuel H. Rudman
Joseph Russello
Andrea Y. Lee
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  (631) 367-7100

*Additional Counsel for Plaintiffs*

25

## <u>CERTIFICATE OF SERVICE</u>

I, William B. Federman, hereby certify that on May 28, 2013, service of the foregoing was accomplished pursuant to ECF as to Filing Users and in compliance with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

/s/ William B. Federman